Sharon K. BURKE, Appellant,

v.

GROOVER, CHRISTIE & MERRITT, P.C., et al., Appellees.

Nos. 07–CV–1407, 07–CV–1420.

District of Columbia Court of Appeals.

Argued March 12, 2009.

Decided July 21, 2011.

294

Patrick A. Malone, with whom Raymond B. Herschthal, Washington, DC, was on the brief, for appellant.

Alfred F. Belcuore, Washington, DC, for appellees.

Before RUIZ and BLACKBURNE–RIGSBY, Associate Judges, and Ferren, Senior Judge.

RUIZ, Associate Judge:

After suffering a stroke in October of 2000, appellant sued appellees for medical malpractice. Following a jury verdict and judgment for appellant on March 19, 2004, appellees challenged application of District of Columbia law to the amount of non-economic damages allowed; and, on appeal, we agreed that the Maryland cap on non-economic damages applied to appellant's claim. *See Drs. Groover, Christie & Merritt, P.C. v. Burke,* 917 A.2d 1110, 1119 (D.C.2007). Following the first appeal, the judgment was paid on March 23, 2007, three years after the original jury verdict was entered.[1] This appeal concerns the interest owed as a result of this three-year delay in satisfaction of the judgment and

1. The jury verdict was for $5,774,156.07. Following the first appeal, the parties agreed that appellant was owed $3,364,156.07, after deducting $1,410,000 that exceeded the Maryland limit on non-economic damages and a *pro tanto* credit of $1,000,000 paid by a co-defendant.

subsequent delay in payment of the post-judgment interest due.

On appeal, appellant presents three arguments:

(1) As a matter of law, the rate of post-judgment interest made applicable to the judgment by D.C.Code § 28–3302(c) is variable, not fixed;

(2) The trial court abused its discretion in applying the statutory exception in D.C.Code § 28–3302(c) by finding "good cause" to reduce the statutory rate of post-judgment interest; and

(3) The trial court failed to address, and thus erred in disallowing, appellant's claim to interest on the undisputed amount of post-judgment interest unpaid for the period between the date the judgment was satisfied (March 23, 2007) and the date the post-judgment interest was ordered by the court (December 12, 2007).

We agree with appellant on the first two points and reverse the judgment on that basis; on the third issue, we remand for further proceedings consistent with this opinion.

## I. D.C.Code § 28–3302(c): The Statutory Rate

 Judgment for the plaintiff in a tort action "shall bear interest." D.C.Code § 15–109. The interest rate applicable to judgments against private parties in the District of Columbia is measured by reference to the Internal Revenue Code, as provided in D.C.Code § 28–3302(c) (2001). That section provides, in relevant part:

The rate of interest on judgments and decrees, where the judgment or decree is not against the District of Columbia, ... or where the rate of interest is not fixed by contract, shall be 70% of the rate of interest set by the Secretary of the Treasury pursuant to section 6621 of the Internal Revenue Code of 1986 ... for underpayments of tax to the Internal Revenue Service, rounded to the nearest full percent, or if exactly ½ of 1%, increased to the next highest full percent; provided, that a court of competent jurisdiction may lower the rate of interest under this subsection for good cause shown or upon a showing that the judgment debtor in good faith is unable to pay the judgment. ...

Section 6621 of the Internal Revenue Code (I.R.C.) in turn defines the Treasury rate applicable to the underpayment of tax: the sum of the Federal short-term rate, as determined by the Secretary of the Treasury "the first month in each calendar quarter," plus three percentage points. I.R.C. § 6621(a) & (b) (2006).

The parties agree (as the statute makes clear) that the applicable rate of interest is based on the variable Treasury Rate for the underpayment of taxes, absent a reduction under the "good cause" exception, which we discuss in the next section. *See* D.C.Code § 28–3302(c); I.R.C. § 6621 (2006). Where they differ is on how that rate is to be applied to a particular judgment during the time that the judgment amount remains unpaid.[2] Appellant argues that the rate fluctuates, consistent with the variable nature of the referenced I.R.C. rate. Appellees contend that the applicable rate is variable only in the sense that it is not a number set by statute, and that although it is based on the fluctuating

---

**2.** When judgment was entered in 2004, the I.R.C. rate was 3%. That rate had risen to 6% by the time the judgment was paid in 2007. The parties agree that if the rate continued to fluctuate throughout the period until payment was made in 2007, the amount of interest owed is $472,900.80; if, however, the rate is determined and fixed as of the time judgment was entered in 2004, the amount of interest owed is $305,277.84.

federal short-term rate, it is fixed as of the time judgment is entered.

Whether § 28–3302(c) provides for a rate of interest that is fixed as of the date of judgment, or one that fluctuates along with the I.R.C. rate during the period from entry of judgment to satisfaction of the judgment, is an issue of first impression.[3] It is a question of statutory construction we review *de novo*. *See Carlson Constr. Co. v. Dupont West Condo., Inc.,* 932 A.2d 1132, 1134 (D.C.2007). In doing so,

> [w]e first look at the language of a statute to interpret a statute. We are required to give effect to a statute's plain meaning if the words are clear and unambiguous. The literal words of a statute, however, are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice.

*Id.* (quoting *District of Columbia v. Bender,* 906 A.2d 277, 281–82 (D.C.2006)). "In the interest of maintaining the cohesion between this court's statutory interpretation and the policy initiatives behind the legislation, we also consult the legislative history of a statute for guidance as necessary." *Robert Siegel, Inc. v. District of Columbia,* 892 A.2d 387, 393 (D.C.2006) (citing *Jeffrey v. United States,* 878 A.2d 1189, 1193 (D.C.2005)).

Both parties argue that the statute's plain language necessitates a holding in their favor. *See Varela v. Hi–Lo Powered Stirrups, Inc.,* 424 A.2d 61, 64–65 (D.C.1980) ("The primary and general rule of statutory construction is that the intent

of the lawmaker is to be found in the language that he [or she] has used." (quoting *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 42 L.Ed. 394 (1897))). Appellant's contention is straightforward: D.C.Code § 28–3302(c) incorporates the I.R.C. rate, which is variable in nature. Appellees, on the other hand, assert that even though the interest rate established by D.C. law is based on the I.R.C.'s variable rate, it is to be fixed as of the date of judgment. They point to the D.C. statute's use of the term "*the rate* of interest," rather than *the rates* of interest, which, they claim, reveals the legislature's intent to apply a fixed rate of interest upon the entry of judgment. We find appellee's argument less persuasive, however, because use of the singular term "rate" does not preclude a variable rate, which is defined as "[a ]*n interest rate* that varies at preset intervals in relation to the current market rate." BLACK'S LAW DICTIONARY 888 (9th ed.2009) (emphasis added). The I.R.C. rate that § 28–3302(c) uses as a reference point is "a variable rate." *See* I.R.C. § 6621(a). Further, other sections of the D.C.Code refer to a "variable *rate* " in the singular, *see, e.g.,* D.C.Code § 31–1371.02(82)(A)(ii)(III) (2001) ("fixed or variable rate"); D.C.Code § 2–1217.06 (2001) ("any fixed or variable rate"); D.C.Code § 26–1113(a)(2)(c) (2001) ("variable rate"), while others refer to a "variable rate or rates." *See, e.g.,* D.C.Code § 28:3–112(b) (2001) ("Interest may be stated in an instrument as a fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates.").

Moreover, the rate of interest in D.C.Code § 28–3302(c) is calculated based

---

**3.** We have said in *dictum* that "[u]nder D.C.Code § 28–3302(c), the interest rate *fluctuates* unless good cause is shown." *Jerome Mgmt., Inc. v. District of Columbia Rental Housing Commission,* 682 A.2d 178, 186 (D.C.

1996) (emphasis added). However, we went on to uphold the trial court's application of the "good cause" exception in the statute. Thus, our affirmance was not based on an interpretation of the applicable rate.

upon the rate "set by the Secretary of the Treasury pursuant to § 6621 of the Internal Revenue Code." That section of the I.R.C. refers to the Federal short-term rate determined by the Secretary of the Treasury "the first month in each calendar quarter." I.R.C. § 6621(a)(2) & (b). Therefore, the use of the singular "rate" in § 28–3302(c) by definition refers to potentially different rates, depending on the quarter for which it is set by the Secretary of the Treasury. Moreover, regulations issued pursuant to I.R.C. § 6621 provide examples of its application that make clear that the rate of interest continues to float during the period of non-payment of tax, and is not fixed as of the date the tax became due. *See* 26 C.F.R. § 301.6621–1(d) (2010) (illustrating in example 6 that the interest rate applicable under I.R.C. § 6621 continues to float during the period the tax remains outstanding). In short, when viewed in the context of the dictionary definition, usage in other statutes and the regulation interpreting the application of the I.R.C. rate, we think the better interpretation of the legislature's use of the singular term "rate" in D.C.Code § 28–3302(c) is one that distinguishes use of the plural "rates" to refer to different types of rates rather than to one variable rate that can fluctuate over time.

This conclusion is supported by an additional inference we draw from another provision of the statute. Subsection (b) provides that "[i]nterest, when authorized by law, on judgments or decrees against the District of Columbia, or its officers, or its employees acting within the scope of their employment, is at the rate of not exceeding 4% per annum." D.C.Code § 28–3302(b). We find it significant that judgments against the government are set at a fixed rate, while at the same time, "where the judgment or decree is not against the District of Columbia," *id.* § 28–3302(c), the rate of interest is variable. Indeed, it is easy to extrapolate a principled basis upon which this distinction was drawn. The District of Columbia must have the benefit of knowing far in advance how much it will owe on any obligation it incurs, lest the administration of and budgeting for a large and multi-faceted bureaucracy become unwieldy—a concern not as commonly applicable to private parties.

■■■■ "Usually '[w]hen the plain meaning of the statutory language is unambiguous, the intent of the legislature is clear, and judicial inquiry need go no further.'" *District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C.2006) (quoting *District of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C.1999)). However, even where the words of a statute appear to be clear, "resort to legislative history may still be appropriate." *Davis v. United States*, 397 A.2d 951, 956 (D.C.1979).

Section 28–3302, as originally enacted, provided a fixed rate of interest of six percent for all judgments. *See* D.C.Code § 28–3302 (1981) ("The rate of interest in the District ... to be allowed in judgments and decrees, in the absence of express contract, is 6 percent per annum."). In late 1981, the Council of the District of Columbia amended § 28–3302, eliminating the six percent fixed rate for private judgments and providing instead that the rate of interest applicable to such judgments would be "70% of the rate of interest set by the Secretary of the Treasury ... for underpayments and overpayments of tax...." D.C. Council, Report of the Committee on Finance and Revenue on Bill 4–138, "Consumer Credit Interest Rate Amendment Act of 1981," at 8 (Oct. 6, 1981). The stated purpose of this amendment was to "increas[e] the rate of interest" applicable to judgments. *Id.* No further explanation for this change is pro-

vided in the Council's documents.[4]

The next year, in March of 1982, Congress amended the federal counterpart to D.C.Code § 28–3302. *See District of Columbia v. Mitchell*, 533 A.2d 629, 654 n. 13 (D.C.1987). Section 1961 of Title 28 of the U.S.Code, which had previously provided that federal courts would use the applicable state (or District of Columbia) law governing interest rates for judgments, was amended so as to "tie the post judgment interest rate to the rate used by the Internal Revenue Service for delinquent taxes under [I.R.C. §] 6621," the same section of the Internal Revenue Code referred to in D.C.Code § 28–3302(c). S.Rep. No. 97–275, at 30 (1982), *reprinted in* 1982 U.S.C.C.A.N. 11, 40; *see also* Federal Courts Improvement Act ("FCIA"), Pub.L. No. 97–164, 96 Stat. 25 (1982). This amendment was deemed necessary because state interest rates "frequently fall[ ] below the contemporary cost of money," whereas the rate referred to in the I.R.C. provided "a composite of prime rates from throughout the country that is reviewed and revised periodically." S.Rep. No. 97–275, *supra*, at 30. By incorporating the I.R.C. rate, FCIA thereby provided for the payment of interest that was more reflective of the actual and current cost of money. *See* I.R.C. § 6621(b)(2)(A); *Brooks v. United States*, 757 F.2d 734, 740 (5th Cir. 1985) ("Amended section 1961 ... replaced

the directive for applying the state rate of interest with a nationwide *variable* rate of interest ...." (emphasis added)).[5]

In 1986, I.R.C. § 6621 was amended so that instead of applying a single rate of interest to underpayments and overpayments of tax, it would apply separate rates: the rate of interest applicable to underpayments (to be paid by the taxpayer) was increased so that it would be 1% greater than the rate applicable to overpayments (to be paid by the government). Tax Reform Act of 1986, Pub.L. No. 99–514, § 1511(a), 100 Stat.2085, 2744. This amendment created ambiguity in D.C.Code § 28–3302(c), in that it now referred to one rate in a federal statute that itself contained two rates. Accordingly, the D.C. Council amended § 28–3302(c) in 1987 by removing the reference to the Treasury's rate of interest for overpayments. D.C. Law 7–61, § 2, 34 D.C.Reg. 7089 (1987). As explained in the Council Judiciary Committee's Report, "[a]s a result of the Congressional amendment there was the possibility that two different rates of interest could apply to the District's judgments or decrees." *See* D.C. Council, Report of the Committee on the Judiciary on Bill 7–269, "District of Columbia Judgments and Decrees Interest–Rate Payments Act of 1987," at 2 (Oct. 7, 1987). The amendment clarified which of the two rates should be applied, and chose the

---

4. A corresponding reason for setting the rate for judgments against the District of Columbia at 4% might have been to lower the rate on interest to be paid from the public fisc. That expectation has been frustrated by recent historically low interest rates.

5. *See also* Senate Report No. 97–275 on the FCIA:

Under current law, the interest rate granted on judgment during appeal is based on varying State laws and frequently falls below the contemporary cost of money. As a consequence, a losing defendant may have an economic incentive to appeal a

judgment solely in order to retain his money and accumulate interest on it at the commercial rate during the pendency of the appeal.

Section 302 amends 28 U.S.C.1961 by setting a realistic and nationally [sic] rate of interest on judgments in the Federal courts. The provision would tie the post judgment interest rate to the rate used by the Internal Revenue Service for delinquent taxes under 26 U.S.C. 6621. That rate is a composite of prime rates from throughout the country that is reviewed and revised periodically.

higher rate applicable to underpayment of tax.

Appellees rely on a statement from this Committee Report which stated that the amendment was intended "to provide a single rate of interest for judgments and decrees...." *Id.* From this statement, appellees argue, "[i]t is impossible to glean anything other than the intent to provide certainty" and, therefore, the rate of interest applicable to judgments ought to be fixed at the time the judgment is entered. This conclusion relies upon a misreading of the amendment's history and purpose. The certainty the Council sought by referring to "a single rate" was to identify, among the two variable rates in I.R.C. § 6621, the rate to which the District's statute would now refer, *i.e.* the higher rate applicable to the underpayment of taxes. We find nothing in the legislative history of the statute to suggest that the Council intended to fix that variable rate as of the date of judgment, or that a variable rate would somehow cause any objectionable uncertainty.

D.C.Code § 28–3302 has not been amended since 1987, a fact that stands in contrast with its federal analogue, 28 U.S.C. § 1961. In 2000, Congress eliminated its incorporation of the Internal Revenue Code interest rate; § 1961 was amended to set the rate at which post-judgment interest is calculated to the "weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding" the date of the judgment. H.R. 5662, 106th Cong. § 307 (2000) (incorporated by reference in Pub.L. No. 106–554 (2000)); *see also* 28 U.S.C. § 1961 (2006). With this change—not adopted in D.C.Code § 28–3302(c)—Congress established that there would be a single, non-fluctuating rate of interest, determined as of the reference variable rate on the *"week preceding the date of the judgment."* In light of the parallel functions of 28 U.S.C. § 1961 and D.C.Code § 28–3302, we think it is appropriate to attribute some significance to the fact that the District's statute was never similarly amended with language fixing the variable I.R.C. rate as of a designated date.

Appellees also rely on the Supreme Court's decision in *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), which, they argue, supports their interpretation that, even before the 2000 amendment, § 1961 provided for a rate of interest that is fixed in relation to the judgment date. As we have had occasion to observe, "federal court constructions of 28 USC § 1961 ... are informative but not binding authority." *Chidel v. Hubbard*, 840 A.2d 689, 699–700 (D.C.2004) (quoting *Bell v. Westinghouse Elec. Corp.*, 507 A.2d 548, 554 (D.C.1986)). Moreover, we do not think that *Kaiser* is informative on the issue before us (whether the statutory variable rate continues to fluctuate during the period of nonpayment) because *Kaiser* stands for the quite separate proposition that, absent a clear statement to the contrary, a legislative enactment affecting substantive rights does not apply retroactively. *See Kaiser*, 494 U.S. at 838, 110 S.Ct. 1570; *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (construing the holding of *Kaiser*). Retroactive application of D.C.Code § 28–3302(c) is not an issue in this case because the statute was enacted many years before judgment was entered against appellees. As discussed, the issue we decide with respect to section 28–3302(c) was addressed, in the federal statute, by an amendment to § 1961 in 2000, ten years after *Kaiser* was decided.

■ Appellees also argue that, in order to provide predictability, any construction of § 28–3202(c) must necessarily allow defendants to estimate the cost of pursuing post-trial and appellate relief. The variable rate, however, is one factor to be taken into account, along with the anticipated time during post-trial motions and appeal. Thus, even if a single rate applied during the period of nonpayment, the duration of the period during which interest accrues cannot be known in advance with precision. As a result, the interest amount that will be due is not capable of exact calculation. That is not to say, however, that an estimate sufficient for the debtor's purposes cannot be made. We think, moreover, that solicitude for the defendant's desire to know in advance its eventual interest payment on an unpaid adverse judgment does not take into account the proper balance sought by a statute providing for interest on judgments. *See Tupling v. Britton*, 411 A.2d 349, 353 (D.C.1980). As the purpose of post-judgment interest is to preserve the value of the judgment for the prevailing party, *see Kaiser Aluminum & Chem. Corp.*, 494 U.S. at 835–36, 110 S.Ct. 1570, a variable rate designed to reflect market rates up to the time that the prevailing party actually receives it will most accurately perform that function. Here, for example, the I.R.C. applicable rate was 3% at the time judgment was entered, but had risen to 6% by the time the judgment was satisfied. A market rate, moreover, is neutral in application and neither favors one party nor disfavors another. Otherwise, "a losing defendant may have an economic incentive to appeal a judgment solely in order to retain his money and accumulate interest on it at the commercial rate during the pendency of the appeal." *Kaiser*, 494 U.S. at 839, 110 S.Ct. 1570 (quoting S.Rep. No. 97–275, *supra* ).

Although the legislative history of D.C.Code § 28–3302(c) is silent on the issue, even if we assume that a desire for predictability animated the Council, this desire would not be frustrated by a fluctuating rate. So long as the basis for the rate calculation is known at the time when the decision to appeal is made, the fact that the rate is variable does not deprive a defendant of the opportunity to manage fluctuations by covering the potential exposure with an appropriate financial instrument. Unlike the judgment creditor, the judgment debtor retains the judgment amount; in those cases where the judgment amount is liquidated (or can be readily liquidated), the judgment debtor will have the ability to purchase some sort of hedge against a variable rate with the very funds it still holds. The judgment creditor does not have this ability. The judgment creditor also has no control over whether the judgment debtor will appeal the judgment (and if so, how vigorously the appeal will be pursued), or the date when the judgment debtor will actually remit the funds.

We, therefore, conclude that the text of D.C.Code § 28–3302, the purpose of post-judgment interest, the regulatory interpretation of the federal rate for underpayment of taxes on which the D.C. provision relies, and the history of the analogous federal statute pertaining to interest on judgments, support the conclusion that the I.R.C. variable rate of interest referred to in § 28–3302(c) is not fixed as of the date of judgment but continues to fluctuate with the market during the period between entry of judgment and satisfaction of the judgment.[6]

---

**6.** Appellees have submitted a survey of the statutes in all fifty states providing for interest on judgments. Some, like 28 U.S.C. § 1961, explicitly provide for a rate fixed in relation to the date of judgment, *see* Ga.Code Ann. § 7–4–12(a) (2003) (referring to prime rate publish-

## II. D.C.Code § 28–3302(c): The "Good Cause" Exception

▮ In this case, judgment was entered on March 19, 2004, but it was not satisfied until March 23, 2007, shortly after this court's decision in the first appeal holding that the Maryland damages cap applied to appellants' non-economic damages, issued on March 8, 2007.

As we have concluded, D.C.Code § 28–3302(c) provides that interest owed on the judgment is defined by reference to the variable rate provided in the Internal Revenue Code for underpayment of taxes, and continues to fluctuate throughout the period that the judgment remains outstanding. The statute permits the court to "lower the rate of interest ... for good cause shown or upon a showing that the judgment debtor in good faith is unable to pay the judgment." D.C.Code § 28–3302(c). Following cross-motions for summary judgment on the issue of the applicable rate of post-judgment interest, the trial court, relying on our decision in *Jerome Management*, note 3, *supra*, concluded that "[the] delay caused by post trial and appellate relief amounts to good cause," and, pursuant to the discretion allowed by § 28–3302(c), set the interest payable on appellant's judgment at a fixed rate of three percent per year—the rate that had been proposed by appellees. This resulted in an interest amount of $305,277.84 for the period from March 19, 2004 to March 23, 2007.

▮ "We review the grant of summary judgment *de novo.*" *Minch v. District of Columbia*, 952 A.2d 929, 936 (D.C.2008). Appellant argues, and we agree, that the trial court erred in reducing the statutory rate of interest applicable to the judgment for "good cause."

In *Jerome Management*, we upheld the trial court's reduction of the statutory rate for post-judgment interest, concluding that nine years of protracted administrative delay, the fault of neither party, warranted the trial court's finding of "good cause." 682 A.2d at 186. The nine-year proceeding in *Jerome Management* resulted from the agency's five-year delay in taking action on the petitioner's claim and loss of the documentary evidence that had been submitted by the parties. *See id.* at 181. Unlike the nine-year delay and administrative mishaps in *Jerome Management*, there is nothing to suggest that the three-year period from entry of judgment in the trial court to decision of the first appeal in this case reflects undue delay or unanticipated complications in the course of post-trial and appellate proceedings.[7] Moreover, beyond "protracted delay," *Jerome Management* also involved other equitable considerations, because the agency's loss

---

ed "on the day the judgment is entered"); Me.Rev.Stat. tit. 14 § 1602–C (1) (2009) (requiring that "applicable post-judgment interest rate must be stated in the judgment" and defining the variable rate underlying post-judgment interest as "the weekly average one-year constant maturity Treasury yield, ... for the last full week of the calendar year immediately prior to the year in which post-judgment interest begins to accrue"), and some explicitly provide for a rate that varies periodically, *see* Kan. Stat. Ann. § 16–204(e) (2009) (providing that rate changes "effective July 1 of each year"). Importantly, appellees can direct the court to no case authority interpret-

ing a statute with language similar to our own.

7. After judgment was entered on the verdict, on March 19, 2004, several motions were filed by appellees, including a motion for judgment as a matter of law, or, in the alternative, for a new trial or remittitur applying the Maryland cap on damages. After these motions were denied by the trial court on July 20, 2004, appellees obtained a stay of execution of the judgment and filed their appeal with this court. The appeal was argued on October 26, 2006, and decided on March 8, 2007.

of documents contributed to the inability of one of the parties to present its claim to the Rental Commission, and, as a result, it was ordered to pay a judgment, with interest. *Id.* at 184.

There are no comparable equities that compel an exception in this case. Aware from *Jerome Management* that a variable interest rate might apply here, see note 3, *supra,* appellees assumed that risk, whether their appeal were to succeed or not. Accordingly, they cannot claim unfair surprise. As discussed earlier, with that knowledge appellees could have acquired a financial instrument to manage the rate exposure. Indeed, the equities tilt against appellees for two reasons. First, although the first appeal extended the period for which post-judgment interest was awardable, appellees succeeded in lowering the judgment considerably by establishing that the Maryland cap in the judgment applied—an equity that cuts against a claim of "good cause" for lowering the rate. The adjusted judgment amount that appellees thought would eventually prevail (and on which they did prevail) provided a sound basis on which to calculate a hedge for their eventual debt for post-judgment interest. Second, reducing the rate in this case, where the duration of the post-trial proceedings was unexceptional, seems particularly inappropriate because appellees benefitted from a market rate of interest during that period that was higher than the rate set by the court. See note 2, *supra.*

■■■■■ "[T]he purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp.,* 494 U.S. at 835–36, 110 S.Ct. 1570 (alteration in original) (quoting *Poleto v. Consolidated Rail Corp.,* 826 F.2d 1270, 1280 (3rd Cir.1987)). If the purpose of post-judgment interest is to be achieved in the majority of cases, the good cause exception allowed by § 28–3302(c) must necessarily apply only in limited and exceptional circumstances and cannot be triggered simply by delay, especially when that delay is within the norm encountered in the usual course of judicial proceedings. To hold otherwise would eviscerate the make-whole principle underlying post-judgment interest.

■■■■ The language of the statutory exception confirms that the trial court should lower the statutory rate only in the unusual case in which equity compels it. Although "good cause" is not defined in the statute, it is paired with the notion that the judgment debtor "in good faith is unable to pay the judgment." D.C.Code § 28–3302(c).[8] Inability to pay in good faith is a far more dire circumstance than the accumulation, by a solvent debtor, of interest at a calculable rate during a reasonably anticipated period of time. Moreover, the Council presumably was aware of the length of post-trial proceedings, including the appeals process. It would seem an odd result, therefore, that the relatively ordinary length of time for such proceedings in this case, with all that went on, see note 7, *supra,* could form the basis for a "good cause" finding on a par with the debtor's inability to pay. Courts in the future would be hard pressed not to find good cause in run-of-the-mill cases. A "good cause" finding here would be a por-

---

8. "The maxim *noscitur a sociis,* that a word [or phrase] is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word [or phrase] is capable of many meanings in order to avoid the giving of unintended breadth" to words in a statute. *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961).

tent threatening to permit the exception to swallow the rule.

 Post-judgment interest is awarded as a matter of course, to preserve the value of a judgment upheld on appeal, and is not a sanction for exercising the right to appeal. *See District of Columbia v. Potomac Electric Power Company*, 402 A.2d 430, 441 (D.C.1979) ("Interest is not imposed on a debtor's obligation in order to exact a penalty. It is imposed to compensate the creditor for the loss of the use of its money."). Although incurring the additional debt of post-judgment interest might have the salutary effect, in some cases, of deterring frivolous appeals, *see Tupling*, 411 A.2d at 353, the knowledge that post-judgment interest will be imposed should not burden good faith appeals, where the decision to appeal will be determined by careful assessment of the merits and the likelihood of success. Appellees, for example, succeeded in establishing that the Maryland cap on non-economic damages applied to the verdict; and even with respect to the denial of the new trial motion that this court determined did not warrant reversal because appellees were neither surprised nor prejudiced by the omission in the pretrial statement, appellees presented plausible arguments on appeal.[9] *See Drs. Groover, Christie & Merritt*, 917 A.2d at 1110. But in every appeal litigants must consider that the court might not ultimately agree with any—or, as in this case, with only some—of their arguments. Part of an appellant's consideration, therefore, must include foreseeing that at least part of the judgment (and interest thereon) might be payable, and making provision for that possibility. Just as we have reasoned that normal delay should not trigger the good cause exception, we similarly think that an appellant's desire or reasonable expectation for complete vindication in the appellate court cannot suffice as good cause to trigger an exception to the rate established in § 28–3302(c).

We conclude that the trial court improperly applied the "good cause" exception in this case, and was bound to apply the interest rate provided for in § 28–3302(c) instead.

### III. Interest for Late Payment of Post-judgment Interest

 Appellant's final contention is that the trial court erred in refusing to award interest on the agreed-upon minimum amount of post-judgment interest during the pendency of the cross-motions for summary judgment on their competing contentions on the applicable interest rate. Appellant's motion urged the court to award post-judgment interest at the statutory variable rate, whereas appellee's motion argued for a fixed three percent. Over the relevant three-year period, the statutory rate was higher than three percent. See note 2, *supra*. Thus, the judge's ruling on the cross-motions would determine whether a higher amount of interest would be due under the statute than the three percent interest that, the parties agreed, would be the minimum due. The delay for which appellant seeks compensation is measured from March 23, 2007, when appellees paid the judgment (namely the principal amount of $3,364,156.07 on which interest due was to be ascertained) to December 12, 2007, when the trial court granted summary judgment to appellees and ordered payment of interest on the

---

9. Appellees sought a new trial, based on appellant's failure to disclose an expert witness's opinion in her pretrial statement. Had appellees prevailed on that point, and the court concluded the error was prejudicial, the judgment would have been vacated, and appellees would have been entitled to a new trial.

judgment at the reduced rate of three percent.[10] The trial court did not address appellant's claim for this additional component of interest.

The crux of appellant's argument is that, once the parties agreed in March 2007 (after this court's decision in the first appeal determined that the Maryland cap applied to non-economic damages) on the judgment amount owed, see note 1, *supra*, the post-judgment interest was calculable within a range, even if the exact rate of interest was subject to the trial court's decision on the parties' competing cross-motions for summary judgment. Because the parties agreed that, at a minimum, interest at three percent would be due, that amount was capable of precise calculation, and became a liquidated debt. Thus, according to appellant, her request for interest to compensate for the delay in payment of the undisputed post-judgment interest is similar to one for pre-judgment interest for a liquidated debt pursuant to D.C.Code § 15–108. Appellees do not dispute they had agreed that a minimum amount of post-judgment interest at three percent was owing as of March 2007. They counter appellant's claim with a legal argument, that there is no authority to award "interest on interest." [11]

D.C.Code § 15–108 (2001) provides:

In an action in . . . the Superior Court of the District of Columbia to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

We have noted that, as a "remedial" statute, section 15–108 "should be generously construed so that the wronged party can be made whole." *Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1255 (D.C.1990). Nonetheless, we do not think that, even under a generous reading, D.C.Code § 15–108 mandates payment of pre-judgment interest in this case because the statutory conditions are not met. This was not an action to recover a liquidated debt but a suit to establish liability in tort and ascertain compensatory damages. Moreover, the interest appellant claims is not on principal, but on post-judgment interest. Thus, the interest claimed by appellant does not come within the terms of D.C.Code § 15–108.

Another statutory provision, D.C.Code § 15–109, authorizes the award of pre-judgment interest in contract actions where the debt is not liquidated, "if neces-

**10.** As we explained in the previous section, that ruling was erroneous because the facts of this case did not warrant a good cause exception to the statutory variable rate.

**11.** Appellees cite our opinion in *Rastall v. CSX Transp., Inc.*, 697 A.2d 46 (D.C.1997), for the proposition that "[§§ 15–108 and 28–3302] do not specify that compound interest may be awarded. Absent a contractual provision, pre-judgment and post-judgment interest are not usually compounded." *Id.* at 53. *Rastall*, however, does not address whether the trial court has authority to award pre-judgment interest outside the purview of § 15–108. Rather, *Rastall* held, consistent with the language of § 15–108, that where the parties

by contract have agreed on the rate of interest, the court is bound to apply that rate in its award of pre-judgment interest. *Id; accord Allen v. Yates*, 870 A.2d 39, 52 (D.C.2005). Otherwise, the rate specified in section 28–3302(c) applies to interest awards. *See District of Columbia v. Pierce Assoc.*, 527 A.2d 306, 311 (D.C.1987); *Giant Food, Inc. v. Jack I. Bender*, 399 A.2d 1293, 1303 (D.C.1979). The holding of *Rastall* was in the context of a contract action, where the contract itself specified a (non-compounding) rate of interest. 697 A.2d at 53. *Rastall* is inapposite to a tort action, where, as we explain in the text, the trial court has equitable discretion to award interest.

sary to fully compensate the plaintiff." *Pierce Assoc.*, 527 A.2d at 310 (noting that trial court has "broad discretion" to award pre-judgment interest under § 15–109); *id.* at 311 (noting that courts are gradually "giv[ing] up the traditional dichotomy between liquidated and unliquidated debts," as evidenced by "the creation of statutes and judicial exceptions, such as that in D.C.Code § 15–109, which give the court discretion to allow prejudgment interest even when the debt amount is unliquidated").

D.C.Code § 15–109 (2001) provides:

In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only. This section does not preclude the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest.

We have interpreted section 15–109 as mandating the award of post-judgment interest in tort actions. *See Duggan v. Keto*, 554 A.2d 1126, 1140 (D.C.1989). Although the statute does not provide for pre-judgment interest in tort actions, as it does in contract cases, we have concluded that such interest is "neither authorized nor forbidden by statute." *Id.*

The question remains, therefore, whether the trial court has equitable discretion—even if not compelled by section 15–108 or expressly authorized by section 15–109—to award interest to compensate an injured party for unwarranted delay in payment of an undisputed amount of post-judgment interest. We recognize the force of appellant's argument that, just as

in 2004, appellees elected not to pay any part of the jury's verdict, and did not satisfy the judgment until three years later, see note 1, *supra*, so too in March 2007, appellees elected not to pay any post-judgment interest—not even the minimum amount that was undisputably due at the fixed three percent rate appellees claimed applied rather than the higher fluctuating rate that appellant claimed (and we now hold) the statute mandated. If the delay in payment of the underlying judgment entitles her to post-judgment interest to compensate for the loss of the time-value of the money she was owed, appellant asks, why shouldn't she be similarly compensated for the time during which appellees withheld payment of the agreed-upon minimum amount of interest? Appellant poses an interesting question. We have defined a "liquidated debt" as one "which at the time it arose … was an easily ascertainable sum certain." *Schwartz v. Swartz*, 723 A.2d 841, 843 (D.C.1998) (quoting *Pierce Assocs.*, 527 A.2d at 311). Thus, even though appellant's claim does not come within the mandatory purview of section 15–108, interest at the minimum rate agreed upon is a "liquidated debt" because it was readily ascertainable in March 2007. Unless there is a prohibition, similar considerations should apply in determining whether interest is appropriate in order to preserve the value of the undisputed amount of interest owed to the plaintiff.

▪ Though D.C.Code § 15–108 and, to a lesser extent, D.C.Code § 15–109, may appear to "occupy the space" in connection with pre-judgment interest, as noted, we have concluded that they do not prohibit the award of pre-judgment interest in tort actions.[12] *See Duggan*, 554

---

12. Federal courts applying 28 U.S.C. § 1961 permit the award of pre-judgment interest

even though that statute requires only that a court award post-judgment interest. *Westing-*

A.2d at 1140. Significantly, the obligation to pay pre-judgment interest arises under the common law and may be payable even in the absence of a statutory authorization to that effect. *See Riggs Nat'l Bank,* 581 A.2d at 1254 ("[N]o explicit statutory authority is required for an award of pre-judgment interest . . . ."); *see also In re Huber,* 708 A.2d 259, 260 (D.C.1998) ("The obligation to pay interest is intertwined with the obligation to make restitution."). Whether to award pre-judgment interest in such circumstances is a determination that lies in the equitable discretion of the trial court. *See Riggs Nat'l Bank,* 581 A.2d at 1253 ("[I]n equity, interest is allowed as a means of compensating a creditor for the loss of the use of his [or her] money.") (quoting *United States v. United Drill & Tool Corp.,* 87 U.S.App.D.C. 236, 237, 183 F.2d 998, 999 (1950)); *see also Owen v. Bd. of Directors of Wash. City Orphan Asylum,* 888 A.2d 255, 270 (D.C. 2005) ("The equitable powers of the trial court to effect remedies are wide and absent an abuse, they should not be circumscribed." (citing *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973))).

We, therefore, clarify that in a tort action a trial court has the equitable power to award "pre-judgment" interest on that part of an interest award whose validity is undisputed.[13] Because the trial court did not consider appellant's request for this additional component of interest, we re-mand the case for the court's consideration and exercise of equitable discretion.

\* \* \*

We hold that the rate of interest applicable to judgments against private parties in the District of Columbia pursuant to D.C.Code § 28–3302(c) is a variable one, and that it continues to fluctuate with the market, on a quarterly basis, from the date of judgment to the date it is paid. We further hold that the "good cause" exception of § 28–3302(c) allowing the trial court to lower the rate of interest applicable to judgments does not apply where the only justification is the usual delay caused by post-trial motions and appellate consideration, and that the trial court erred in determining that an exception was warranted in this case. We also hold that the trial court has equitable authority to award interest on the undisputed amount of post-judgment interest that remained unpaid during the court's consideration of the cross-motions for summary judgment.

We, therefore, reverse and remand with instructions that the trial court enter judgment ordering appellees to pay (1) the agreed-upon amount ($167,677.92) reflecting the difference of post-judgment interest calculated using the variable rate required by statute and the three percent fixed rate the trial court erroneously applied, and (2) such interest, if any, on the undisputed minimum amount of post-judgment interest ($305,277.84) as the trial

*house Credit Corp. v. D'Urso,* 371 F.3d 96, 100 (2d Cir.2004) (award of post-judgment interest is "mandatory" under § 1961); *In re Burlington Northern,* 810 F.2d 601, 609 (7th Cir. 1986) ("While [§ 1961] does not preclude pre-judgment interest, the award of such interest is committed to the discretion of the [trial] court and is to be based upon equitable considerations.").

**13.** That the total amount of the interest award is disputed does not affect the "liquidated" nature of that part of the interest award the debtor concedes is valid. *See District Cablevision Ltd. P'ship v. Bassin,* 828 A.2d 714, 732 (D.C.2003) (in the case of a liquidated debt under § 15–108, recognizing that even a judgment debtor's attempt to *offset* the liquidated amount does not affect the debtor's obligation to pay pre-judgment interest thereupon (citing *Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293, 1302–03 (D.C.1979))).

court deems is warranted by appellees' failure to pay any post-judgment interest from March to December 2007.

*So ordered.*