*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CV-55

MAURICE F. NACCACHE, *ET AL.*, APPELLANTS,

V.

ANGELA M. TAYLOR, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAM-8012-07)

(Hon. John Ramsey Johnson, Trial Judge)

(Argued September 20, 2017　　　　　　　Decided December 21, 2018)

*Carl J. Schifferle*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellants.

*Keith W. Donahoe*, with whom *Frank R. Kearney* was on the brief, for appellee.

Before FISHER and BECKWITH, *Associate Judges*, and STEADMAN, *Senior Judge*.

BECKWITH, *Associate Judge*:　A Superior Court jury awarded appellee Angela Taylor $6.5 million in damages following a trial at which she alleged that appellant Maurice Naccache, an obstetrician employed by the District of

Columbia, had provided negligent prenatal care that led to her son's premature birth and his severe and permanent developmental injuries. The District of Columbia, which participated in the trial on Dr. Naccache's behalf and continues to participate here, challenges two of the trial court's orders pertaining to the jury award. At issue in this appeal is the meaning of the statute providing for interest on judgments against the District of Columbia "at the rate of not exceeding 4% per annum," D.C. Code § 28-3302 (b) (2018 Repl.), and the validity of a lien the District imposed upon Ms. Taylor's jury award in order to secure reimbursement for all Medicaid expenses incurred by Ms. Taylor's son following the entry of judgment.

The jury's award included damages "with interest, thereon at the statutory rate and their costs of action." Of the $6.5 million awarded, the jury allocated $3.3 million to future care costs, but did not allocate any portion of the judgment for past Medicaid expenses.[1] Two weeks after the October 2010 verdict, the District filed a Health Care Reimbursement Lien—or Medicaid lien—on Ms. Taylor's judgment in the amount of $764,277.46 for Medicaid payments the District made

---

[1] The jury also awarded $1.2 million for lost earnings and earning capacity; $1 million for past physical pain, emotional distress, disfigurement and deformity; and $1 million for future physical pain, emotional distress, disfigurement and deformity.

for Ms. Taylor's son's medical care prior to the entry of judgment. The District also filed a motion for a remittitur of $1.8 million in the award of "future care costs." After the trial court denied the District's request to reduce the amount of the jury award, the District twice amended the lien, first to $779,928.81 in August 2013 and then again to $851,233.07 in January 2015—figures that for the first time included Medicaid expenses incurred after the verdict.[2]

In March 2015, more than four years after the verdict and almost two years after this court affirmed the judgment on appeal,[3] the court entered a consent order establishing that the jury award would be "placed in a Special Needs Trust for the sole benefit" of Ms. Taylor's son,[4] but that the amount the District asserted as a Medicaid lien for pre- and post-judgment expenses—at that time, some $850,000—would be placed into the court registry pending a final order on the

---

[2] This latter figure thus included both the $764,277.46 in prejudgment Medicaid expenses—for which the District no longer seeks reimbursement on appeal—and $86,955.61 in post-judgment payments up to that point in time. In its reply brief the District represented that as of the time of filing, the post-judgment medical expenditures covered by Medicaid payments had increased further to $115,881.89.

[3] In their appeal from the jury's verdict awarding Ms. Taylor $6.5 million, Dr. Naccache and the District challenged the validity of the judgment on various grounds. In *Naccache v. Taylor*, 72 A.3d 149 (D.C. 2013), this court rejected those claims and affirmed the judgment.

[4] A Special Needs Trust is sometimes also called a "supplemental needs trust."

validity of the lien. At oral argument, counsel for Ms. Taylor represented that prior to this time, she had not received any portion of the judgment because the judgment was automatically stayed when the District filed its first appeal, and that as a result, in the interim, she had qualified for and collected Medicaid payments.

In the months following the issuance of the consent order, the trial court issued two additional orders granting motions filed by Ms. Taylor: the first, in July 2015, approved costs and interest on the judgment at 4% per year pursuant to D.C. Code § 28-3302 (b),[5] and the second, in December 2015, granted declaratory and injunctive relief striking as invalid the Medicaid lien the District had imposed on the judgment. Dr. Naccache and the District now appeal from these orders. For the reasons explained below, we affirm the trial court's decision to strike the Medicaid lien for all future care costs after the creation of the supplemental needs trust, but reverse the order striking the District's lien for medical care costs covered between the entry of the judgment in 2010 and the establishment of the trust in 2015. We also reverse the order awarding interest at 4% per year and remand for clarification as to whether the trial court exercised its discretion in making that award.

---

[5] After Ms. Taylor filed this motion, the parties stipulated to, and the trial court approved in a consent order, costs of $13,178.91 in the trial court and $1,278.91 in this court, rendering the motion moot as to costs.

## I.    The Post-Judgment Interest Order

D.C. Code § 28-3302 (b) provides that "[i]nterest, when authorized by law, on judgments or decrees against the District of Columbia, or its officers, or its employees acting within the scope of their employment, is at the rate of not exceeding 4% per annum."   At issue here is whether "not exceeding 4% per annum" means that a trial court may award up to 4% interest or that it must award exactly 4%.  The District argues that the trial court erred by awarding Ms. Taylor interest at a fixed rate of 4%, and that the court instead should have awarded interest at the lower rate applicable in suits against private parties.  Ms. Taylor argues that § 28-3302 (b) required the court to award interest at 4% or, alternatively, that it permitted the court to award interest at 4%, and so the trial court did not abuse its discretion by doing so.

We review questions of statutory interpretation de novo.  *E.g.*, *District of Columbia v. Place*, 892 A.2d 1108, 1110–11 (D.C. 2006); *District of Columbia v. Cato Inst.*, 829 A.2d 237, 239 (D.C. 2003).  To interpret the language of a statute, we start with "the plain meaning if the words are clear and unambiguous."  *Place*, 892 A.2d at 1111.  "[T]he words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them."  *Id.* (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753

(D.C. 1983) (en banc)).  Likewise, rather than reading statutory words in isolation, we "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme." *Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc) (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)).

In common usage, the word "exceed" means "to extend outside of" or "to go beyond a limit set by." *Webster's Third New International Dictionary* 791 (2002). To "not exceed," then, means that the rate of interest shall not "extend outside of" or "go beyond the limit set by."  The statute is not ambiguous.  The text of the statute reflects that the D.C. Council's intent was to set a cap on the rate of interest on judgments against the District and its officers at 4%, and neither party offers a competing interpretation of the plain language.  The two other subsections in § 28-3302 reinforce this understanding.  Had the D.C. Council intended to set an interest rate on judgments against government officials at 4%—no more no less—the Council could have stated, as it did in subsection (a), that the rate "is" 4%, or stated, as it did in subsection (c), that the rate "shall be" 4%.[6]  Instead, the D.C.

---

[6]  For the same reason, we are unpersuaded by the District's argument that the trial court was required to apply the interest rate applicable to private parties, subject to a 4% cap.  Section 28-3302 (c) governing interest on judgments against private parties expressly excludes interest on judgments against "the District of Columbia, or its officers, or its employees acting within the scope of their employment."  Moreover, as Ms. Taylor notes in her brief, the D.C. Council considered and then chose not to enact a proposal to add to § 28-3302 (b)

(continued…)

Council instructed in § 28-3302 (b) that the interest imposed against government officials "is at the rate of not exceeding 4% per annum," and we are bound to adhere to that language absent a compelling reason to the contrary.

The legislative history does not provide such a reason. Section 28-3302 (b) originated from a subsection of an 1890 appropriations Act of Congress addressing payments of judgments against the District of Columbia, which provided "[t]hat hereafter interest, when authorized by law, on judgments against the District, in suits begun after the passage of this act, shall be at the rate of not exceeding four per centum per annum." Act of Sept. 30, 1890, ch. 1126, 26 Stat. 504, 514. In 1901, Congress established a code of law for the District, which, among other things, enacted the rate of interest to be allowed in judgments, setting it at 6%. *See* Act of Mar. 3, 1901, ch. 854 § 1178, 31 Stat. 1377. The following year, Congress clarified that its 1901 codification of a rate of interest in the District "shall not be construed to amend, alter or repeal the rate of interest fixed at four per centum per annum on judgments against [the District] by the Act approved September [30, 1890]." Act of July 1, 1902 ch. 1352, 32 Stat. 590, 610.

---

(…continued)
qualifying language that the rate "shall be at the rate described in subsection (c) . . . provided that the rate shall not exceed 4%." 2015 Washington D.C. Legislative Bill No. 669, Section 1033, *Fiscal Year 2017 Budget Support Act of 2016*.

In Ms. Taylor's view, this characterization of the 1890 act as having "fixed" the interest rate at 4% demonstrates that Congress agreed the interest rate on judgments against the District was required to be 4%. Based on the plainness of the "not exceeding" language and the lack of any indication that Congress perceived itself as clarifying an ambiguity in the 1890 act, however, we agree with the government that the language from the 1902 act did not intend to dramatically alter its meaning but simply described the prior law imprecisely. The subsequent history of the law supports this. In 1964, Congress enacted D.C. Code § 28-3302, which provided that "[i]nterest, when authorized by law, on judgments against the District of Columbia, is at the rate of not exceeding [4%] per annum." Act of Aug. 30, 1964, Pub. L. No. 88-509, 78 Stat. 667, 675. In the committee reports Congress indicated that this codification was "not intended to make any substantive change in existing law." H.R. Rep. No. 88-1556 at 2, 11 (1964); S. Rep. No. 88-1323 at 2, 10 (1964). And despite subsequent amendments to § 28-3302[7] by the D.C. Council, the Council has maintained the "not exceeding" language and done nothing to resurrect the counterintuitive notion suggested by Congress's 1902 interpretation that an interest rate "not exceeding" 4% is a rate that is or shall be 4% and no less. Even if we accepted Ms. Taylor's understanding

---

[7] D.C. Law 4-70, § 2, 28 D.C. Reg. 5236 (1982); D.C. Law 7-82, § 2, 34 D.C. Reg. 8117 (1988).

of the 1902 act, we are not persuaded that a legislative statement made decades prior to the most recently amended language by a different legislative body from the one that passed the current law can thwart the plain language of this unambiguously worded statute. *See, e.g.*, *Tippett*, 10 A.3d at 1131; *United States Parole Comm'n v. Noble*, 693 A.2d 1084, 1103 (D.C. 1997).

Ms. Taylor highlights our case law in contending that the statute should be interpreted as a fixed rate and not a cap. But our case law does not necessitate this conclusion. In *Burke v. Groover, Christie & Merritt, P.C.*, 26 A.3d 292 (D.C. 2011), which addressed whether the rate of post-judgment interest under § 28-3302 (c) was variable or fixed, we held that it was "not fixed as of the date of judgment but continues to fluctuate with the market during the period between entry of judgment and satisfaction of the judgment." *Id.* at 300. In reaching this conclusion, we found it "significant that judgments against the government are set at a fixed rate, while at the same time, 'where the judgment or decree is not against the District of Columbia' . . . the rate of interest is variable." *Id.* at 297 (quoting § 28-3302 (c)).

Focusing on the words "fixed rate," Ms. Taylor argues that in *Burke*, we specifically held that the interest rate on judgments against the District must be set at 4%. As the District notes, however, this line in *Burke* may be read to say either

that the rate on judgments is "fixed" at 4% or that it is "fixed" at the time of judgment. Given the court's focus upon the fluctuation in interest rates on judgments against private parties under § 28-3302 (c) between the time such judgments are entered and the time they are satisfied, the better reading of the line Ms. Taylor emphasizes is that the rate of interest against the District under § 28-3302 (b)—in contrast to § 28-3302 (c)—is "fixed" at the time of entry and therefore does not fluctuate before satisfaction of judgment. *See also District of Columbia Office of Human Rights v. District of Columbia Dep't of Corr.*, 40 A.3d 917, 929 n.11 (D.C. 2012) (citing to *Burke* and referring to the 4% rate under § 28-3302 (b) as a "cap").[8]

The trial court in this case granted Ms. Taylor's request for interest at 4% per year, but it was not clear whether, in doing so, the court interpreted § 28-3302 (b) as a cap or as a fixed rate.[9] We therefore remand to allow the court to explain

---

[8] In *District of Columbia v. Mitchell*, 533 A.2d 629 (D.C. 1987), this court addressed whether § 28-3302 (b), "which allows 4% interest on judgments against the District while permitting interest at the prevailing rate on all other judgments, violate[d] the equal protection guarantee in the due process clause of the fifth amendment." *Id.* at 654. The court's conflicting characterizations of the parties' arguments in terms of the legislature having "*set* the interest rate at 4%," *id.* at 654 (emphasis added), and the statute being one that "*limits* interest on judgments against the District to 4%," *id.* at 633 (emphasis added), make it difficult for us to glean much insight from *Mitchell* on the question before us.

[9] Our uncertainty stems from multiple potentially conflicting statements.
(continued…)

how it arrived, in its discretion, at the rate of 4% or, if it viewed itself as having no discretion, to now exercise such discretion in determining the rate of interest to which Ms. Taylor is entitled.

## II.    The Medicaid Lien Order

The District also challenges the trial court's order striking its lien encumbering the judgment, which was imposed to reimburse the District for all future post-judgment Medicaid expenses.  The District argues that it is entitled, under federal and local law, to collect from the judgment the costs it will incur for continued health-care assistance to Ms. Taylor's son for the duration of his life— notwithstanding that the award has been placed in a supplemental needs trust—and contends that the trial court will be able to determine how such an open-ended and

---

(…continued)

The trial court first stated "that the plain language of the statute provides a ceiling of 4% per year for interest rates applying to judgments against the District . . . . The language simply mandates that the interest rate applied is not to exceed 4%." The court then added, however—in expressing disagreement with the District's argument that the proper interest rate should be that applicable to private litigants—that this court "has interpreted [the statute] as establishing a fixed rate of interest," citing *Burke*, 26 A.3d at 297–98 n.4, an opinion that we have noted could be interpreted in two different ways.  Finally, the court concluded that "[i]n light of the Court of Appeals' interpretation of this statute, as well as the plain language of the statute itself, the Court declines the District's request to apply an interest rate of lower than 4% to this judgment."  On this record it remains unclear whether the trial court reached this conclusion as a matter of discretion under one interpretation of *Burke* or because it viewed *Burke* as compelling this conclusion.

forward-looking lien should operate. In the alternative, the District argues that it is at the very least entitled to recover for the amount of Medicaid assistance provided to Ms. Taylor's son in the period between the entry of judgment in 2010 and Ms. Taylor's actual receipt of the judgment award in 2015, before the award was deposited in the supplemental needs trust.

### A. The Governing Framework

The Medicaid program[10] "provides free medical care in the form of public assistance" to those who qualify, based on financial need, "for receipt of such benefits," and the federal government and participating states divide the costs for providing this care. *District of Columbia v. Jackson*, 451 A.2d 867, 875 (D.C. 1982) (Kelly, J. concurring). The program is a cooperative one, in that each state that elects to participate—as the District of Columbia has—must administer its own program under a plan that conforms to federal requirements. *See* 42 U.S.C. § 1396a. One such requirement is that each state seeking reimbursement for Medicaid expenses must "take all reasonable measures to ascertain the legal liability of third parties . . . to pay for care and services available under the plan," 42 U.S.C. § 1396a (a)(25)(A), and then, "in any case where such liability is found to exist after medical assistance has been made available[,] . . . seek reimbursement

---

[10] 42 U.S.C. §§ 1396–1396w-5 (2012).

for such assistance to the extent of such legal liability." 42 U.S.C. § 1396a (a)(25)(B). To the extent that the state provides medical assistance where a third party is liable for those payments, the state must have in place laws establishing that the state is "considered to have acquired the rights of such individual to payment by any other party for such health care items or services." 42 U.S.C. § 1396a (a)(25)(H). Similarly, "[f]or the purpose of assisting in the collection of medical support payments," each state plan must condition eligibility for medical assistance by requiring Medicaid recipients to assign to the state any rights to reimbursement "for medical care from any third-party." 42 U.S.C. § 1396k (a)(1)(A).

In compliance with these federal provisions, the District of Columbia enacted its own third-party liability statutes to effectuate reimbursement. "As soon as the District begins providing health-care assistance to a beneficiary, it shall become subrogated to any right or claim that the beneficiary has against a third party for the care and treatment it has undertaken to provide or pay for as health-care assistance." D.C. Code § 4-602 (b) (2012 Repl.). Pursuant to § 4-607 (a), the District is entitled to a lien on "any judgment or settlement awarded or executed in favor of a beneficiary against a third party for that amount of the judgment or settlement that represents the care and treatment it has undertaken to provide or pay for as health-care assistance." The beneficiary of a judgment has the "right to

retain the amount of judgment or settlement that remains after the deduction" of whatever amount is necessary to "reimburse the District for medical assistance payments the District has made on behalf of the beneficiary." § 4-607 (c).

The District's right to reimbursement for Medicaid expenses is to some degree limited, however, by the federal anti-lien provision contained in 42 U.S.C. § 1396p,[11] which provides that "[n]o lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan, except pursuant to the judgment of a court on account of benefits incorrectly paid on behalf of such an individual" or in certain other circumstances not relevant here. The Supreme Court first addressed the tension between § 1396p and the third-party liability provisions in *Arkansas Department of Health and Human Servs. v. Ahlborn*, 547 U.S. 268 (2006). There, the Court reviewed an Arkansas law that automatically imposed a lien on a tort settlement in an amount equal to Medicaid costs. *Id.* at 272. The plaintiff had brought suit for injuries sustained in a car accident, seeking damages for past medical costs, permanent injury, and future medical costs, among other expenses. *Id.* at 273. The parties settled out of court, stipulating that approximately 6% of

---

[11] Section 1396a (a)(18) requires that a state Medicaid plan comply with § 1396p.

the plaintiff's settlement represented payments for medical costs. *Id.* at 274. When the government asserted a lien against the settlement proceeds for the cost of medical care payments, the plaintiff filed an action to invalidate the lien. *Id.* The Court held that the third-party liability provisions, §§ 1396a (a)(25) and 1396k (a), were exceptions to the anti-lien provision, but that these exceptions were limited to payments for medical care. *Id.* at 284–85. In other words, a lien in an amount equal to Medicaid costs could only be imposed on the portion of the settlement specifically designated for medical costs, even if the expended Medicaid payments exceeded the amount so designated.

The Court took this holding one step further in *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013).[12] At issue in *Wos* was whether a North Carolina statute "requiring that up to one-third of any damages recovered by a beneficiary for tortious injury be paid to the State to reimburse it for payments it made for medical treatment" was preempted by the federal anti-lien provision, given that the statute applied regardless of what (if any) percentage of an award was designated

---

[12] In October 2017, Congress passed the Bipartisanship Budget Act of 2013, Pub. L. No. 113-67, § 202 (b), which effectively overturned the decisions in *Ahlborn* and *Wos* by permitting states to attach a lien equal to the amount of Medicaid costs regardless of whether a portion of an award was designated for medical costs. On February 9, 2018, however, Congress confirmed in the Bipartisanship Budget Act of 2018 that *Ahlborn* and *Wos* remained good law. Pub. L. No. 115-123, § 53102 (b)(1).

to cover payments for medical care. *Id.* at 630. The Court held that the statute was preempted because it selected an arbitrary number and "by statutory command" labeled that number as representing payment for medical care, rather than providing a process for actually determining what portion of a beneficiary's tort recovery was attributable to medical expenses. *Id.* at 636.

The parties dispute how this governing framework applies to the present case, which in our view presents two questions: whether the District is entitled to an open-ended lien for all medical costs that it will cover since Ms. Taylor placed the award in a supplemental needs trust in 2015, and whether the District is entitled to reimbursement for the medical care it covered from the time judgment was entered in 2010 following the jury verdict until the time the trust was established in 2015.[13]

## B. The Validity of a Lien on Post-2015 Trust Payments

The jury rendered its verdict in 2010, but Ms. Taylor represented at oral argument, and the District has not disputed, that she did not actually take possession of the award until satisfaction of the judgment in 2015—at which time

---

[13] Whether the District is entitled to the lien it seeks to impose is a matter of statutory construction, which we review de novo. *Tippett*, 10 A.3d at 1126.

she deposited the sum into a Medicaid supplemental needs trust.[14] The District's position is that it is "entitled to reimbursement for any amount of the judgment that represents medical expenses it will pay through Medicaid" by way of a lien. The District does not say how such a lien would operate or from what escrow account the funds would be drawn, but indicates that the trial court will be equipped to make this determination on remand.

We begin with Ms. Taylor's contention that *Ahlborn* clarified that federal law limits a state's recovery to proceeds shown to be properly allocable to past medical expenses, and because the jury's verdict did not include such an award, *Ahlborn* precludes the District from asserting its lien. As some courts have noted and as the split among various courts reveals, the decision in *Ahlborn* did not make clear whether a state may assert a lien against settlement proceeds or a portion of a judgment allocable to future medical expenses to reimburse medical expenses already paid on behalf of a Medicaid recipient.[15] But even those courts wrestling

---

[14] As noted above, the court ordered that $850,000 of the jury award would be placed into the court registry pending a decision on the amount of the District's asserted Medicaid lien.

[15] Some courts have interpreted *Ahlborn* to limit the state's recovery to proceeds specifically allocated to past medical expenses. *See, e.g.*, *In re E.B.*, 729 S.E.2d 270, 299 (W.Va. 2012); *In re Hudelson*, 196 P.3d 905, 912–13 (Idaho 2008), *abrogated on other grounds by Verka v. St. Alphonsus Reg'l Med. Ctr.*, 265 P.3d 502, 508 (Idaho 2011); *Willoughby v. Agency for Health Care Admin.*, 212
(continued…)

with which post-allocation funds a state may reach readily conclude that the state is entitled to reimbursement for medical expenses already provided.

We need not address whether a claim for a lien to cover future payments may be permissible in circumstances other than those presented here. Fundamentally, and ultimately dispositive on the issue in this case as to future payments, Congress added a provision—in the same section as the anti-lien provision of the U.S. Code—that allows parties who obtain a judgment to continue to qualify for public benefits such as Medicaid while supplementing their future care needs through the use of a Medicaid supplemental needs trust. *See* 42 U.S.C. § 1396p (d)(4)(A). Not just anyone may establish such a trust. Congress limits

---

(…continued)
So. 3d 516, 524 (Fla. Dist. Ct. App. 2017); *Bolanos v. Superior Court*, 87 Cal. Rptr. 3d 174, 180 (2008); *Price v. Wolford*, 2008 WL 4722977, *2 (W.D. Okla. Oct. 23, 2008); *McKinney ex rel. Gage v. Philadelphia Hous. Auth.*, 2010 WL 3364400, *9 (E.D. Pa. Aug. 24, 2010). Other courts, in contrast, have interpreted *Ahlborn* to allow the state to recover from proceeds allocable to future medical care as well. *See, e.g.*, *Giraldo v. Agency for Health Care Admin.*, 208 So. 3d 244, 251–52 (Fla. Dist. Ct. App. 2016); *In re Matey*, 213 P.3d 389, 394 (Idaho 2009); *I.P. ex rel. Cardenas v. Henneberry*, 795 F. Supp. 2d 1189, 1197 (D. Colo. 2011); *see also Special Needs Trust for K.C.S. v. Folkemer*, 2011 WL 1231319, at *12 (D. Md. Mar. 28, 2011) (holding, prior to the Supreme Court's decision in *Wos*, that the government might be permitted to recover for past medical care provided from an unstipulated amount that might represent payments for future medical expenses).

eligibility to those who are under age 65 and disabled[16] and requires that the trust actually be established for the benefit of such a person[17] and that it be established and maintained by a third party. *Id*; 42 U.S.C. § 1396p (d)(4)(C)(i). The entire purpose of a supplemental needs trust is to ensure that those who sustain serious injury continue to be able to meet their basic needs—out of the recognition that a jury or settlement award may not adequately cover the "extraordinary costs" a person with a lifelong serious disability is likely to incur in medical treatments and other expenses. *E.g.*, John Staunton and Leo J. Govoni, *Special Needs Trusts: Planning Vehicles That Have Come of Age*, Marquette's Elder's Advisor, Vol. 3: Iss. 4, Article 7 at 29–31, http://scholarship.law.marquette.edu/cgi/viewcontent.cgi ?article=1222&context=elders; *In re D.M.B.*, 979 A.2d 15, 16 n.1 (D.C. 2009); Jennifer Field, *Special Needs Trusts: Providing for Disabled Children Without Sacrificing Public Benefits*, 24 J. Juv. L. 79, 79 (2004). To fulfill this purpose, the statute provides that the state will receive whatever remains in the trust upon the

---

[16] A person qualifies as "disabled" for purposes of this statute "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A).

[17] 42 U.S.C. § 1396p (d)(4)(B) defines under what circumstances a trust is established "for the benefit of an individual." The District does not dispute that the trust in this case satisfies these or any other requirements.

death of the beneficiary, "up to an amount equal to the total medical assistance paid on behalf of the individual under the State plan." 42 U.S.C. § 1396p (d)(4)(A).

Ms. Taylor argues that the District's proposed forward-looking lien in the amount of all medical care the District will provide from creation of the trust until Mr. Taylor's death would undermine the whole point of supplemental needs trusts and the "statutory scheme established by Congress." We agree. A jury determined that Ms. Taylor's son was disabled as a result of Dr. Naccache's negligence and awarded a judgment to compensate him for the resulting costs he will incur. No one disputes that Mr. Taylor qualified for a supplemental needs trust, and with the judgment assets now protected in such a trust, Mr. Taylor will continue to be able to receive public benefits while supplementing those payments with the trust's funds, as intended by Congress.

The District contends that if it is not able to obtain reimbursement now and moving forward for all future medical care it will cover, it is possible that the trust will have no assets remaining to reimburse the District for any Medicaid expenditures upon Ms. Taylor's son's death. This is precisely correct, but essentially amounts to a recitation of the decision Congress made when enacting § 1396p (d)(4)(A). Congress specifically provided that the state (or District) is

entitled to all amounts remaining in a supplemental needs trust upon the death of the beneficiary, "up to an amount equal to the total medical assistance paid on behalf of the individual." 42 U.S.C. § 1396p (d)(4)(A). Although it may be that the trust could be depleted before the beneficiary's time of death, leaving nothing for the government to collect in reimbursement, that is the balance Congress chose to strike. *See In re E.B.*, 729 S.E.2d 270, 309 (W.Va. 2012) (Workman, J., concurring in part and dissenting in part).

The cases the District cites in arguing that a party may not "shelter" judgments from parties imposing Medicaid liens do not support the District's contention that it should be entitled to place a lien on funds already in a supplemental needs trust for an amount not yet even established. In *Sullivan v. Cty. of Suffolk*, 174 F.3d 282 (2d Cir. 1999), for example, the court held that the plaintiff was required to satisfy a Medicaid lien before using the settlement proceeds to establish a supplemental needs trust. *Id.* at 286. But the lien in place reflected known costs already incurred by the government in Medicaid expenses up until the time of settlement, and the government sought to collect these assets from an escrow account before the money had been placed in the trust. *Id.* at 284.[18] The

---

[18] *See also* Brief of Lienor-Appellee at 5, *Sullivan v. Cty. of Suffolk*, 174 F.3d 282 (2d Cir. 1999) (presenting the issue to be addressed as "whether liens of the Medicaid Program encumbering personal injury actions of recipients must be

(continued…)

court rejected the argument that because the government may collect the assets remaining in a trust upon a beneficiary's death, the plaintiff was therefore entitled to shield all assets awarded in a settlement from any preexisting Medicaid lien—an argument that Ms. Taylor does not make here, as the District has waived its lien for past medical care provided prior to the entry of judgment. The remaining two cases the District relies on are similarly distinguishable. *See Cricchio v. Pennisi*, 90 N.Y.2d 296, 303, 307 (1997) (referring to assets only "earmarked" for a supplemental needs trust and a lien to "recoup from responsible third parties the medical assistance paid to the plaintiffs"); *Northwest Bank of N.D., N.A. v. Doth*, 159 F.3d 328, 333 (8th Cir. 1998) (again referring only to pre-settlement expenditures).

The District further contends that absent a lien, it will have to pay the same expenses twice, through the judgment and through Medicaid. This is again correct—at least to the extent that any funds remaining upon the death of the beneficiary are insufficient to cover such payments—and again in line with the express purpose of a supplemental needs trust: that a beneficiary may retain an award while still qualifying for public benefits, so that the award may cover all

_____

(…continued)
satisfied before the recipient receives any money with which to fund a supplemental needs trust.").

expenses not covered by other payers. *See In re Matey*, 213 P.3d 389, 392 n.7 (Idaho 2009). If the District were permitted to calculate all future medical costs, and subtract that amount from a trust, the purpose of establishing a supplemental needs trust would be undermined. And if a party elected not to establish a supplemental needs trust, he or she would in all likelihood no longer qualify for Medicaid benefits in any case.

In sum, because we conclude that the District's proposed open-ended lien on funds now in the supplemental needs trust is contrary to Congress's purpose for establishing such trusts under § 1396p (d)(4)(A), we affirm the trial court's order striking the lien as to any amount that the District may cover in Medicaid payments after the date of deposit in the trust.

### C. Reimbursement for the 2010-2015 Medicaid Payments

Even if it is not entitled to recover for payments for medical care costs made after the trust was established, the District contends that it at least is entitled to recovery from the judgment for medical care payments made during the five-year period prior to the establishment of the trust. We agree with the District on this point.

As already indicated in the discussion above, while it may be disputed as to the degree that a lien can reach future payments, it is another matter where, as here,

recovery is sought for payments actually made. By its wording, the District lien clearly covers payments actually made. Nor do we find anything in the federal or local Medicaid laws that would prohibit the District from seeking reimbursement for post-judgment medical costs already paid. We note that Federal law requires Medicaid recipients "to assign to the State *any* rights . . . to payment for medical care from any third party," 42 U.S.C. § 1396k (a)(1)(A) (emphasis added), instructs them to assist the state in identifying and pursuing "*any* third party who may be liable to pay for care and services *available under the plan*," 42 U.S.C. § 1396k (a)(1)(B) (emphases added), and entitles states to retain such part of the amount collected "as is necessary to reimburse it for medical assistance payments made on behalf of an individual," 42 U.S.C. § 1396k (b). The District's health-care assistance reimbursement statute, enacted in accordance with these provisions, similarly provides that the District "shall have a lien . . . upon any judgment or settlement awarded or executed in favor of a beneficiary against a third party *for that amount of the judgment or settlement that represents the care and treatment it has undertaken to provide or pay for as health-care assistance*." D.C. Code § 4-607 (a) (emphasis added). These provisions are not limited to reimbursement for prejudgment medical payments.

Alternatively, Ms. Taylor argues that the District is estopped from asserting any lien because it imposed the lien only after failing to obtain its requested $1.8

million remittitur, neglected to present any expert testimony related to its claim for future expenses or apprise Ms. Taylor of its envisioned lien, and failed to request an itemized verdict form to reflect future health care costs that would be covered by Medicaid. We see no merit in this argument. It is undisputed that the judgment was stayed until the final action of our court upholding the judgment. The right to reimbursement was not contingent on the lien itself, D.C. Code § 4-602, and the lien was perfected in the statutory manner prior to "payment of any part of a judgment," D.C. Code § 4-607.

In sum, we conclude that the District was entitled to reimbursement for medical payments made after judgment was entered awarding Ms. Taylor $3.3 million for future care costs and before the supplemental needs trust was established. Consequently, we hold that the Superior Court erred in striking that portion of the District's lien.[19]

---

[19] Ms. Taylor argues that, even if the District could assert a lien on a judgment for future *medical expenses*, it is not entitled to assert a lien on a judgment for *future care costs*, which includes both medical and non-medical costs. Here, it appears likely that the award for future care costs includes an award for future medical expenses far in excess of the District's lien. But to the extent that this remains an issue on remand, the trial court may conduct further proceedings to determine the proper allocation of the award for "future care costs" to ensure that the District's lien is limited to that portion of the judgment that is "designated as payments for medical care," *Wos*, 568 U.S. at 627 (quoting *Ahlborn*, 547 U.S. at 284). *See id.* at 638 ("When the State and the beneficiary are

(continued…)

## III.

For the foregoing reasons, we reverse the order granting interest on the judgment at 4% per year and remand for further proceedings consistent with this opinion.  We affirm the order striking the District's lien on the judgment for all future care costs after the creation of the supplemental needs trust in 2015, but reverse the order striking the District's lien for the period between the entry of judgment in 2010 and establishment of the supplemental needs trust in 2015.

*So ordered.*

---

(…continued)

unable to agree on an allocation, *Ahlborn* noted, the parties could 'submit the matter to a court for decision.'") (quoting *Ahlborn*, 547 U.S. at 288) (alteration adopted).