*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## 18-CV-1296

SAUDI AMERICAN PUBLIC RELATIONS AFFAIRS COMMITTEE, *ET AL*., APPELLANTS,

v.

INSTITUTE FOR GULF AFFAIRS, *ET AL*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-4709-18)

(Hon. Robert R. Rigsby, Associate Judge)

(Argued January 9, 2020                      Decided December 10, 2020)

*Ryan K. Hart* for appellant.

*David M. Schwartz* for appellee.

Before EASTERLY, *Associate Judge*, and STEADMAN and FISHER, *Senior Judges.**

---

\* Senior Judge Fisher was an Associate Judge of the court at the time of submission. His status changed to Senior Judge on August 23, 2020.

EASTERLY, *Associate Judge*:  A blogger published statements allegedly made by appellant, Salman Al-Ansari, about appellees, the Institute for Gulf Affairs ("IGA") and Ali Al-Ahmed (together, the "IGA Parties").  Perceiving these statements to be defamatory, the IGA Parties sued both Mr. Al-Ansari and his organization, the Saudi American Public Relations Affairs Committee ("SAPRAC").  SAPRAC and Mr. Al-Ansari (together, the "SAPRAC Parties") filed a special motion to dismiss the IGA Parties' suit under the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act ("D.C. Anti-SLAPP Act"), D.C. Code §§ 16-5501 to -5505 (2012 Repl. & 2020 Supp.).  The trial court summarily denied the SAPRAC Parties' motion based on its determination that they had failed to make the requisite threshold "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest."  D.C. Code § 16-5502(b).  We conclude that the trial court erred both by failing to hold a hearing as required by § 16-5502(d), and by concluding that the SAPRAC Parties failed to make out a prima facie case under § 16-5502(b).  Accordingly, we reverse and remand for further proceedings.

## I. The Anti-SLAPP Act

A strategic lawsuit against public participation, or SLAPP, is "an action filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016) (internal quotation marks omitted). The D.C. Anti-SLAPP Act provides a party defending against a SLAPP with procedural tools to protect themselves from "meritless" litigation. *Id.* at 1226–27; *accord Fridman v. Orbis Bus. Intelligence Ltd.*, 229 A.3d 494, 502 (D.C. 2020). One of the procedural tools conferred on a defendant by the statute is the ability to file a special motion to dismiss a complaint in order to bring an expedited end to the litigation. *See* D.C. Code § 16-5502.

In litigating this motion, the defendant must "make[] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). The statute defines an "[a]ct in furtherance of the right of advocacy on issues of public interest" to mean, in relevant part, "[a]ny written or oral statement made . . . [i]n a place open to the public or a public forum in connection with an issue of public interest." D.C. Code § 16-5501(1)(A)(ii). An "[i]ssue of public interest" is defined as "an issue related

to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place." D.C. Code § 16-5501(3). The statute expressly omits from its definition of an issue of public interest "private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance." D.C. Code § 16-5501(3).

Once the defendant has made this prima facie showing, which is "not onerous," *Doe No. 1 v. Burke* ("*Burke I*"), 91 A.3d 1031, 1043 (D.C. 2014) (internal quotation marks omitted), "the burden shifts to the . . . plaintiff, who must demonstrate that the[ir] claim is likely to succeed on the merits," *Mann*, 150 A.3d at 1227 (footnote and internal quotation marks omitted). If the plaintiff cannot carry their burden, the defendant's motion must be granted and the lawsuit dismissed with prejudice. D.C. Code § 16-5502(b), (d). The trial "court is required to hold an 'expedited hearing' on the motion and to issue a ruling 'as soon as practicable after the hearing.'" *Mann*, 150 A.3d at 1232 (quoting D.C. Code § 16-5502(d)). The denial of a special motion to dismiss is immediately appealable. *Id.* at 1228.

## II.  Factual Background and Procedural History

SAPRAC and IGA are organizations in the Washington, D.C. area that publicize and promote discussion of issues pertinent to the Persian Gulf Region. SAPRAC holds itself out as a lobbying organization working to promote U.S.-Saudi relations, and IGA self-identifies as an independent and nonpartisan think tank.  Mr. Al-Ansari and Mr. Al-Ahmed founded SAPRAC and IGA, respectively, and each represents his organization publicly in a variety of media, including television interviews and written work.

After SAPRAC arranged for the Secretary General of the World Muslim League to speak at the 2018 Conference of Presidents of Major American Jewish Organizations about religious tolerance in Islamic communities, Mr. Al-Ahmed published an article on IGA's website criticizing SAPRAC's inclusion among the conference organizers.  The article denounced the conference's organizers, the leadership of major Jewish organizations, and the Washington Institute for Near East Policy for "invit[ing]" SAPRAC—an organization identified in the IGA Parties' complaint as an agent for the Saudi government—to participate in an event focused on "emerging tolerance . . . in the Muslim world."  The article questioned SAPRAC's participation because of Mr. Al-Ansari's links through his father to

"virulent anti-Semitism" and "violent Islamic intolerance" of Judaism. Mr. Al-Ahmed called on Mr. Al-Ansari to distance himself from his father and appealed to other organizations to denounce SAPRAC.

Subsequently, a blogger allegedly interviewed Mr. Al-Ansari and published purported statements by him responding to Mr. Al-Ahmed's critique. In the post, the blogger briefly summarized Mr. Al-Ahmed's article. He then quoted Mr. Al-Ansari as defending his father and countering that Mr. Al-Ahmed "cares nothing for the sincere shared collective of ideas and cultures." In addition, Mr. Al-Ansari allegedly called Mr. Al-Ahmed "a terrorist himself" and asserted that Mr. "Al-Ahmed and his cronies" at IGA were "dangerous" and "subversive"; that Mr. Al-Ahmed "will use any means to exterminate the prospects of a peaceful world" and "will destroy anything in his path, even if he has to kill it to get there"; and, similarly, that Mr. Al-Ahmed and the IGA "will use any destructive means possible to promote their own misguided agenda of their own brand of terrorism." The SAPRAC Parties deny that Mr. Al-Ansari made these statements.

The IGA Parties sued the SAPRAC Parties for defamation, false light invasion of privacy, and intentional infliction of emotional distress. Rather than answering the complaint, the SAPRAC Parties filed a special motion to dismiss

pursuant to the Anti-SLAPP Act. The trial court denied the motion without a hearing,[1] reasoning that the SAPRAC Parties had not made the prima facie showing that they were defendants in a SLAPP.

Specifically, the trial court ruled that the SAPRAC Parties failed to show that the claims against them arose "from an act in furtherance of the right of advocacy on issues of public interest." The trial court acknowledged that "[r]elations between the Gulf Region (including Saudi Arabia) and the United States [were] surely related to both economic and community well-being," and thus constituted an issue of public interest. But the court concluded that Mr. Al-Ansari's statements were not "related to" that topic. Rather, they "related primarily to Al-Ahmed himself," who the court ruled was neither a general- nor a limited-purpose public figure.[2] Because the court ruled that the SAPRAC Parties had not made a prima facie case that they were defendants in a SLAPP, the court did not advance to the second step of the inquiry to determine whether the IGA

---

[1] The SAPRAC Parties also filed a motion to dismiss under Super. Ct. Civ. R. 12(b)(6). The trial court granted this motion in part and denied it in part. We do not address this motion in this appeal.

[2] *See Burke I*, 91 A.3d at 1041 (adopting the "definition of public figure used throughout defamation law" for purposes of the Anti-SLAPP Act (internal quotation marks omitted)).

Parties had shown that they were likely to succeed on the merits. This appeal of the trial court's ruling followed.[3]

## III. Analysis

### A. The Hearing Requirement for a Special Motion to Dismiss

As a procedural matter, the SAPRAC Parties claim that the trial court erred in failing to hold a hearing pursuant to D.C. Code § 16-5502(d) before making its ruling on their special motion to dismiss. We review this question of statutory interpretation de novo. *See Mann*, 150 A.3d at 1233.

"The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Thorne v. United States*, 55 A.3d 873, 878 (D.C. 2012). Section 16-5502(d) expressly provides that "[t]he court shall hold an expedited hearing on the special motion to dismiss, and

---

[3] The SAPRAC Parties filed a motion for relief from judgment pursuant to Superior Court Civil Rule 59 before they filed a Notice of Appeal from the denial of their special motion to dismiss. The trial court subsequently denied the Rule 59 motion. The SAPRAC Parties did not file a separate notice of appeal from the Rule 59 order. *See generally Hawkins v. Howard Univ. Hosp.*, 151 A.3d 900, 903 (D.C. 2017) (discussing the procedure under D.C. Court of Appeals Rule 4(a)(4)(B), if a Rule 59 motion is pending when a Notice of Appeal is filed).

issue a ruling as soon as practicable after the hearing." The word "hearing" is not defined in the statute, but we generally construe undefined terms "according to their ordinary sense and with the meaning commonly attributed to them," *Naccache v. Taylor*, 199 A.3d 181, 184 (D.C. 2018) (internal quotation marks omitted), "taking into account the context in which they are employed." *Flores v. United States*, 37 A.3d 866, 868 (D.C. 2011) (internal quotation marks omitted).

We conclude that the directive in D.C. Code § 16-5502(d) to a trial court to "hold a[] . . . hearing" before ruling on a special motion to dismiss requires that court to conduct a real-time proceeding (attended in person or remotely accessed) at which the parties may present arguments or evidence to a judge, as is appropriate under the circumstances. This understanding is supported by the dictionary definition of the word "hearing" as "[a] judicial session, usu[ally] open to the public, held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying." *See Hearing*, Black's Law Dictionary (11th ed. 2019). And it is consistent with our interpretation of judicial "hearing" requirements in other statutes, for example, D.C. Code § 23-110[4] and the Innocence Protection Act

---

[4] D.C. Code § 23-110(c) (2012 Repl.) ("Unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon . . . .").

("IPA"),[5] where a "hearing" is understood to refer to a proceeding that allows real-time interaction between a judge and the parties, not merely the opportunity to have the trial court consider written submissions by the parties. *See, e.g.*, *Bethea v. United States*, 170 A.3d 192, 193 (D.C. 2017) (reversing and remanding where trial court failed to hold a "hearing" pursuant to D.C. Code § 23-110(c) to allow movant to substantiate his arguments and instead "summarily" denied his motion); *Bouknight v. United States*, 867 A.2d 245, 250, 257–58 (D.C. 2005) (affirming trial court's denial of Innocence Protection Act motion "without another [separate from § 23-110] hearing," where trial court had "review[ed] the parties' written submissions"); *Smith v. United States*, 608 A.2d 129, 130–31, 133 (D.C. 1992) (reversing trial court's denial of § 23-110 motion without a hearing, where trial court ruled on basis of motion, "files and records of the case," and appellant's "additional submissions in support of his motion").

These examples of statutory hearing requirements demonstrate not only that it is well understood in the District's courts that a "hearing" contemplates a real-time, interactive proceeding, but also that our legislative bodies know how to draft

---

[5]  D.C. Code § 22-4135(e)(1) (2012 Repl.) ("Unless the motion and files and records of the case conclusively show that the movant is entitled to no relief, the court shall  . . . grant a prompt hearing thereon . . . .").

statutes that give trial courts some discretion *not* to hold a hearing. In both D.C. Code § 23-110 and the IPA, the legislature (Congress and the Council of the District of Columbia, respectively) created exceptions to the hearing requirements, allowing for a decision on "the motion and files and records of the case" if they "conclusively show" no relief is warranted. See *supra* notes 4 & 5. By contrast, the Anti-SLAPP Act's hearing requirement is categorical: "The court *shall* hold an expedited hearing . . . ." D.C. Code § 16-5502(d) (emphasis added). Accordingly, we conclude that the trial court erred when it did not hold a hearing as required by the statute.[6]

The IGA Parties acknowledge that the "traditional" understanding of a hearing is a real-time, interactive proceeding as discussed above. But, relying on two cases interpreting the word "hearing" in the context of challenges to federal

---

[6] The trial court acknowledged error when it denied the SAPRAC Parties' Rule 59 motion, see *supra* note 3, but the court concluded that the error was harmless. Order Den. Defs.' Opposed Mot. to Alter, Amend, or Vacate the Judgment, Mar. 29, 2019, at 5 (explaining that "[w]hile the Court agrees that the statute provides for a hearing, this Court ultimately found that Plaintiffs' claims do not arise from an act in furtherance of the right of advocacy on issues of public interest," and thus "[d]efendants cannot show prejudice based on this Court decision to rule without a hearing").

administrative rulemaking and rate setting, respectively,[7] they argue that we should interpret the hearing requirement under D.C. Code § 16-5502(d) differently and hold that it is satisfied if the court accepts and considers written submissions before ruling. The IGA Parties' interpretation of D.C. Code § 16-5502(d) ignores the full text of this provision, which conceives of an "expedited hearing" as an event to be "h[e]ld," at a particular point in time, *after* which the court must "issue a ruling as soon as practicable."[8] Moreover, we fail to see what bearing case law discussing

---

[7] *United States v. Florida E. Coast Ry. Co.*, 410 U.S. 224 (1973) and *ICC v. Louisville & Nashville R.R. Co.*, 227 U.S. 88 (1913).

[8] Consistent with the Superior Court's Rules, this hearing supplements the written filings submitted by the parties; it is not obviated by them. *See* Super. Ct. Civ. R. 12-I(h) (providing inter alia that "[a] party may specifically request an oral hearing by endorsing at the bottom of the party's motion or opposition, above the party's signature, 'Oral hearing requested.'"). The IGA Parties argue that Rule 12-I(h) recognizes a distinction between hearings that are "oral" and those that are not. On the contrary, the Rule uses the words "oral hearing" and "hearing" interchangeably, demonstrating that the terms are understood to have the same meaning in Superior Court:

> **Rule 12-I(h) Hearing**: **When Allowed.** A party may specifically request an oral hearing by endorsing at the bottom of the party's motion or opposition, above the party's signature, "Oral Hearing Requested"; but the Court in its discretion may decide the motion without a hearing. If the judge assigned to the case decides to hold a hearing on the motion, that judge must give to all parties appropriate notice of the hearing and may specify the matters to be addressed at the hearing and the amount of time afforded to each party. . . .

Rule 12-I(i), specifying the procedure if one party fails to appear "at the time the case is called for hearing on a petition or motion," likewise draws no distinction between an "oral hearing" and a "hearing," and contemplates the latter to refer to a live proceeding distinct from the submission of motions. Super. Ct. Civ. R. 12-I(i).

hearing requirements for federal administrative rulemaking has on our interpretation of the District's Anti-SLAPP Act, which creates a distinct procedural tool to be used to combat certain lawsuits filed in court. *Cf. United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 239 (1973) (acknowledging that the term "hearing" has a distinct meaning in the administrative rule-making context).

The IGA Parties additionally argue that allowing the trial court to dispense with a real-time, interactive proceeding advances the objective of the Anti-SLAPP statute to expeditiously terminate the litigation of SLAPPs. But, as discussed, the language of the statute controls and it expressly builds in time for an "expedited hearing," after which the court should "issue a ruling as soon as practicable." D.C. Code § 16-5502(d). Beyond the text of § 16-5502(d), other provisions of the statute demonstrate that the Council's aim to promptly terminate the litigation of SLAPPs was tempered by an underlying goal to ensure that both parties had opportunity to flesh out their arguments. In particular, § 16-5502(c)(2) allows the trial court to authorize targeted discovery if it appears this "will enable the plaintiff to defeat the motion." Surely, if the plaintiff in a SLAPP, whose "meritless claims" the statute seeks to deter, *Mann*, 150 A.3d at 1239, may engage in limited discovery without injecting undue delay into the resolution of a special motion to dismiss, the court may conduct a real-time, interactive proceeding so the parties

can be heard on the expedited motion after they have submitted written pleadings without defeating the aims of the statute.

Finally, we disagree that the legislative history, such as it is, indicates that the Council sought to promote speed over process by dispensing with a hearing requirement as that is generally understood in the District's courts.[9] The Council acknowledged that it was enacting the District's statute against the backdrop of a myriad of anti-SLAPP statutes from other states. *See* Report on Bill 18–893, at 3. Some of these statutes instruct courts to swiftly resolve SLAPPs without specifically requiring a hearing.[10] Had the Council wished to similarly streamline the resolution of Anti-SLAPP motions, it could have followed one of these models and omitted the language "hold a[] . . . hearing" from D.C. Code § 16-5502(d). The Council opted not to do so and included an "expedited hearing" requirement.

---

[9] The Committee Report contains no detailed discussion of the statute's hearing requirement. *See* "Anti-SLAPP Act of 2010," D.C. Council, Report on Bill 18–893, at 7 (Nov. 18, 2010).

[10] *E.g.*, Ind. Code § 34-7-7-9(c) (2020) ("The court shall make its determination based on the facts contained in the pleadings and affidavits filed and discovered under the expedited proceeding"); Me. Stat. tit. 14, § 556 (2019) ("In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.").

For all of these reasons, we hold that, before a trial court may rule on a special motion to dismiss, it must, pursuant to D.C. Code § 16-5502(d), hold a real-time "hearing" (attended in person or remotely accessed), at which the parties may present arguments or evidence to a judge, as is appropriate under the circumstances.  The failure to conduct such a proceeding in this case was error.

## B. The Prima Facie Case Requirement for a Special Motion to Dismiss

Our analysis does not end with the determination that a hearing should have been held.  The SAPRAC Parties argue that (1) the trial court additionally erred by mistakenly concluding that they had failed to make the prima facie showing required by D.C. Code § 16-5502(b) that "the claim at issue arises under an act in furtherance of the right of advocacy on issues of public interest"; (2) pursuant to the statute, the burden should have shifted to the IGA Parties to show that their "claim is likely to succeed on the merits"; and (3) because the IGA Parties cannot carry this burden, the special motion to dismiss should be granted.  For their part, the IGA Parties argue that, because the trial court correctly determined that the SAPRAC Parties had failed to make the requisite prima facie showing, we should affirm because "there is no way in which [the failure to hold a hearing] affected the substantial rights of the parties."  Because these arguments implicate whether remand is required and what should be litigated on remand, we turn to examine the

prima facie showing requirement for a special motion to dismiss under D.C. Code § 16-5502(b) and the relevant definitional provisions in D.C. Code § 16-5501. This is the first time we have had occasion to interpret this statutory language. Our review is de novo. *See Mann*, 150 A.3d at 1233.

Preliminarily, we note that both parties invite us to follow the precedent of other states, including California and Texas, interpreting their anti-SLAPP statutes. We decline to do so. Although numerous other states have enacted anti-SLAPP legislation espousing the same general goals as our statute, *see* Report on Bill 18–893, at 2–3; see also discussion *supra* Section III.A, those statutes vary in language and scope, and state courts have interpreted them in divergent ways. *Compare, e.g.*, Tex. Civ. Prac. & Rem. Code § 27.001(3), (7) (West 2015), *and Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (extending anti-SLAPP protections to statements made entirely in private so long as they touch on an issue of public concern), *with, e.g.*, Cal. Civ. Proc. Code § 425.16(e)(3) (West 2016), *and* D.C. Code § 16-5501(1)(A)(ii) (requiring that the statement be made "[i]n a place open to the public or a public forum" to receive protection under anti-SLAPP statute); *compare also, e.g.*, *FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156, 1166 (Cal. 2019) (holding that under California's anti-SLAPP act, a statement must "contribute[] to" or "participate[] in or further[] some public conversation on the

issue" of public interest in order to be "in connection with" that issue), *with, e.g.*, *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (holding that a statement need not "specifically mention" or have "more than a tangential relationship" to the public issue to receive protection under Texas's anti-SLAPP statute; rather, the statement need only be "in connection with" that public issue (internal quotation marks omitted)).   Rather than selectively follow other state court decisions, we return to basic principles of statutory interpretation to construe the D.C. Anti-SLAPP Act and look to the plain language of the statute.   *See District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006).

Section 16-5501(3) expansively defines an "[i]ssue of public interest" to encompass issues that "relate[] to" a set of wide-ranging, and somewhat nebulous, categories, among them "health," "safety," and "environmental, economic, or community well-being."   This drafting choice indicates both that issues of public interest should be liberally interpreted and that the statements need not explicitly refer to a qualifying topic.   Further, although the definition expressly carves out "private interests," it does so in a manner that suggests that intermixing public and private interests is not disqualifying.   A statement may still relate to an issue of public interest so long as it is not "directed primarily" at a private interest.   D.C. Code § 16-5501(3).   Lastly, § 16-5501(1)(A)(ii) adds even more play in the joints

by providing that, to qualify for protection from a SLAPP as an "act in furtherance of the right of advocacy on issues of public interest," a statement need only be "in connection with an issue of public interest," rather than, for example, "about" or "directly concerning" such an issue.[11]  While these overlapping definitions are somewhat cumbersome and do not lend themselves to a linear reading, we must accept the Council's language and the corresponding breadth of coverage it confers on "issue[s] of public interest."

Looking beyond D.C. Code § 16-5501, we must place its definitional text in functional context.  *See Thomas v. United States*, 171 A.3d 151, 153 (D.C. 2017) ("Interpreting a statute or a regulation is a holistic endeavor, whereby we consider a statute in the context of its entire statutory scheme and the language of surrounding and related paragraphs." (internal quotation marks omitted)).  A special motion to dismiss under D.C. Code § 16-5502 triggers a burden-shifting mechanism:  The filing party must make a "not onerous," *Burke I*, 91 A.3d at 1043 (internal quotation marks omitted), "prima facie showing that the claim at issue

---

[11]  The statute also incorporates a publication requirement for a statement, which may be oral or written.  In this case, neither party disputes that Mr. Al-Ansari's alleged statements to an interviewer, incorporated in a blog post, were published "in a place open to the public or a public forum," D.C. Code § 16-5501(1)(A)(ii).

arises from an act in furtherance of the right of advocacy on issues of public interest."[12] D.C. Code § 16-5502(b). The burden then shifts to the nonmoving party to justify continued litigation of the claim by showing a likelihood of success on the merits, by far the meatier of the statute's two steps. *See Mann*, 150 A.3d at 1237 (explaining that Anti-SLAPP Act's procedures "impose requirements and burdens on the claimant that significantly advantage the defendant," "without placing a corresponding evidentiary demand on the defendant who invokes the Act's protection"); *see also id.* at 1240–62 (analyzing the second step). This burden-shifting mechanism appears designed to swiftly subject to greater scrutiny claims based on statements concerning matters that are arguably of public concern, while allowing claims that arise from purely or predominantly private disputes to proceed along the normal litigation path (which has its own means of weeding out legally or factually baseless claims, *see* Super. Ct. Civ. R. 12(b)). *See* Report on Bill 18–893, at 4 (explaining that the special motion to dismiss gives SLAPP

---

[12] We cannot agree with the IGA Parties' contention that a defendant must concede making the alleged statements to invoke the protection of the Anti-SLAPP Act and file a special motion to dismiss. The statute requires that the defendant "make[] a prima facie showing that the *claim at issue* arises from" the type of conduct protected by the statute. D.C. Code § 16-5502(b) (emphasis added). It does not require proof that the act underlying the claims actually occurred, which would undercut the statute's goal of giving defendants in a SLAPP an opportunity to "economically dispense [with] litigation" implicating acts of public advocacy. Report on Bill 18–893, at 4.

defendants "substantive rights to expeditiously and economically dispense [with] litigation aimed to prevent their" public advocacy). The fact that showing a claim concerns a statement "in connection with an issue of public interest" does not immediately warrant dismissal, but instead only invokes the burden-shifting procedure, reinforces our understanding that what amounts to a statement "in connection with an issue of public interest" should be generously construed to advance the goal of the statute, to "deter SLAPPs." *Mann*, 150 A.3d at 1235.

Based on this understanding of the relevant text of the Anti-SLAPP Act, we hold that the SAPRAC Parties made at least a prima facie case that Mr. Al-Ansari's alleged statements were "in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16–5502(a). Although the trial court seemed to cast the "suggested conflict between the parties" as a purely interpersonal matter and ruled that these statements "related primarily to Mr. Al-Ahmed," we conclude that the statements did not reflect a purely or even "primarily" private dispute, D.C. Code § 16-5501(3), and were sufficiently connected to several issues of public interest.[13]

---

[13] In concluding that Mr. Al-Ansari's alleged statements were not "in connection with an issue of public interest," the trial court found that Mr. Al-Ahmed was not a public figure. *See Burke I*, 91 A.3d at 1041–42. Because this determination also appears to have been based on the trial court's narrow

(continued…)

To be sure, the statements mostly focused on Mr. Al-Ahmed as an individual. But, as the post in which they were published stated at the outset, they were made in the context of "a firestorm . . . between two competing Mid-East special interest groups." The larger concern was related to issues of community well-being: who should participate in a "major policy conference" about religious tolerance "in the Muslim world"; whether SAPRAC, alleged by the IGA Parties to be a Saudi-government affiliated entity, should be included in such a policy discussion; and whether U.S. policy groups should interact with an entity like SAPRAC. It was in this context that Mr. Al-Ansari, responding to Mr. Al-Ahmed's critiques of SAPRAC and Mr. Al-Ansari's father, allegedly called Mr. Al-Ahmed "a terrorist himself" and asserted that Mr. Al-Ahmed and his "cronies" at IGA were "dangerous," "subversive," and willing to "use any destructive means possible," including "kill[ing]," "to promote their own misguided agenda of their own brand of terrorism."[14] In short, these attacks on Mr. Al-Ahmed and IGA

---

(…continued)

conception of the relevant controversy, we authorize the SAPRAC Parties, if they wish, to seek further consideration of this issue on remand, consistent with the principles in this opinion.

[14] The SAPRAC Parties also assert that the alleged statements relate to "safety" under D.C. Code § 16-5501(3). Their argument appears founded on the fact that Mr. Al-Ansari used certain words when talking about the IGA Parties, for example, describing them as "dangerous" and asserting that Mr. Al-Ahmed would "destroy anything in his path, even if he has to kill it to get there." We are

(continued…)

appear to have been fueled by differing policy views, and their apparent purpose to discredit Mr. Al-Ahmed and IGA and to elevate SAPRAC in the larger policy debate sufficiently connects these statements to an "issue of public interest."[15]

Because the SAPRAC Parties carried their prima facie burden, their special motion to dismiss should not have been summarily denied. Instead, the trial court should have turned to the second step of the inquiry, whether the IGA Parties could show they were likely to succeed. D.C. Code § 16-5502(b). We disagree with the SAPRAC Parties that we can examine this issue in the first instance. We remand the case to the trial court to hold a hearing, see *supra* Section III.A., and rule on this question. *See van Leeuwen v. Blodnikar*, 144 A.3d 565, 569 (D.C. 2016).

---

(…continued)
skeptical that a defendant may invoke the protections of the Anti-SLAPP Act simply because they used a specific glossary of words in the alleged statements giving rise to the SLAPP, but we need not resolve this question.

[15] This is not to say that we endorse the use of disparaging discourse in policy debates, and we note that the farther a speaker strays from a more nuanced explication of disagreements about thoughts and ideas, the easier it may be for the target of their speech to show that their statements "contain[] or impl[y] provably false statements of fact." *Mann*, 150 A.3d at 1242 (internal quotation marks omitted).

**IV.**

For the foregoing reasons, we reverse and remand for proceedings consistent with this opinion.

*So ordered.*