*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-1049 & 17-AA-1094

DISTRICT OF COLUMBIA PUBLIC SCHOOLS,
PETITIONER/INTERVENOR,

V.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES,
RESPONDENT

AND

MARSHA KARIM,
INTERVENOR/CROSS-PETITIONER.

On Petition for Review of an Order of the
Compensation Review Board
(CRB No. 61-17)

(Argued October 22, 2020                    Decided October 28, 2021)

*Caroline S. Van Zile*, Deputy Solicitor General for the District of Columbia, with whom *Karl Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, and *James C. McKay, Jr.*, Senior Assistant Attorney General, were on the brief for petitioner/intervenor.

*Robert A. Taylor, Jr.* for intervenor/cross-petitioner.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*:  Marsha Karim injured her right arm and shoulder in a work-related automobile accident in 2009, when she was employed as a social studies teacher by the District of Columbia Public Schools (DCPS).  She received temporary disability benefits before returning to work in 2011.  Upon her return, she promptly claimed to have aggravated her injury and, three years later, sought a so-called "schedule award" for permanent partial disability benefits in relation to her injury.  An Administrative Law Judge (ALJ) concluded Karim had suffered a 27% permanent impairment to her "right upper extremity" and granted her a schedule award commensurate with that impairment, along with an award of compound interest.  The Compensation Review Board (CRB) approved that 27% rating over DCPS's objections, but determined interest on that award should be computed on a simple rather than a compound basis.  The CRB remanded to the ALJ to revise the award accordingly.  Before the ALJ could do so, the Office of Risk Management (ORM) intervened with its own computation of the award under new regulations shifting the authority to do so to ORM.

The cross-petitions for review now before us present three issues.  In its petition, DCPS argues the 27% impairment rating includes an unjustified and unexplained 10% increase over the 17% rating that it concedes is supported by the evidence.  We disagree and find the 27% impairment rating is adequately explained

and supported by substantial evidence. In her cross-petition, Karim makes two arguments. She first argues that, contrary to the CRB's conclusion, the ALJ had equitable discretion to award her compound interest on her award. We disagree and uphold the CRB's determination that simple interest alone was warranted here. Karim's second argument involves the new regulations mentioned above, shifting authority to ORM to calculate the award due to Karim. At bottom, her challenge to those regulations concerns whether (a) the ORM acted within its authority when it passed regulations providing that certain schedule awards are reviewable exclusively by ORM's Chief Risk Officer, or instead (b) as Karim argues, those regulations exceeded ORM's authority so that claimants seeking a schedule award continue to have a right to a hearing before an ALJ, along with a right to review by the CRB. The CRB agreed with DCPS that ORM's regulations altering the process for reviewing schedule awards were valid, and our recent opinion in *Frazier v. District of Columbia Dep't of Emp't Servs.*, 229 A.3d 131 (D.C. 2020), binds us to do the same. We therefore affirm.

## I.

Karim sustained injuries to her right shoulder, arm, neck, and lower back as a result of a work-related automobile accident in 2009. At the time, DCPS employed

her as a social studies teacher at Eastern High School. Following the injury, an MRI revealed a number of torn muscles in her shoulder, though Karim had received surgery to the same shoulder to repair a torn rotator cuff two months before the accident. Karim filed a workers' compensation claim with the public-sector workers' compensation program—which we refer to simply as "the program"— established by the Comprehensive Merit Personnel Act (CMPA). The program accepted her claim and awarded her temporary total disability benefits from December 2009 to August 2011, when her physician released her to return to work. After returning to work for just one day, Karim claimed to have aggravated her injuries while breaking up a fight between students. She filed another request for temporary disability benefits, but the program denied it after determining her injuries were not related to the incident at school. She appealed the decision to a Department of Employment Services (DOES) ALJ, who upheld the program's determination. Karim then retired on disability in February 2012.

Karim filed a new claim with the program for a partial permanent disability "schedule award" in 2014. She underwent three separate medical evaluations related to that claim, two of which are relevant here. In the first, Karim's treating physician Dr. Jeffrey Sabloff concluded that she had a torn rotator cuff and degenerative disc disease. Based largely on the American Medical Association's *Guides to the*

*Evaluation of Permanent Impairment* (6th ed. 2009), Dr. Sabloff opined that Karim

had a 50% partial permanent disability to her "right upper extremity."[1] At DCPS's

request, Karim also received an independent medical evaluation by Dr. Stanley

Rothschild. Dr. Rothschild determined that Karim had "a 19% upper extremity

impairment," a figure he reduced by 5% based on her pre-existing shoulder injuries.

In other words, he found she had a permanent 14% impairment attributable to her

job-related injury. The program issued a decision accepting Karim's claim for a

schedule award and granting her a one-time lump sum payment of $51,544.97, based

on Dr. Rothschild's 14% impairment rating.

Karim appealed to a DOES ALJ and requested a substantially higher award

based on a 50% permanent disability in line with Dr. Sabloff's impairment rating.

After an evidentiary hearing, ALJ Gwenlynn D'Souza issued a compensation order

nearly doubling the program's 14% impairment rating to 27%. Relying on Dr.

---

[1] The upper extremity includes the arm and shoulder. *See Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 200 A.3d 1244, 1251–52 (D.C. 2019). The AMA's Guides are generally consulted when determining the extent of a schedule award. *See* D.C. Code § 32-1508(3)(U-i) (2019 Repl.) ("In determining [permanent partial] disability" under the program's private-sector analogue, "the most recent edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment may be utilized."); 7 D.C.M.R. § 140.5 (2017) (directing claimants for permanent disability compensation under the CMPA to produce "a permanent disability rating performed in accordance with the most recent edition of the AMA Guides from a qualified physician").

Rothschild's and Dr. Sabloff's roughly consistent findings concerning four of six measures of functionality—flexion, extension, abduction, adduction—the ALJ assigned a 17% impairment rating based on those factors alone, which nobody challenges now. She did not specifically credit the assessment of either doctor regarding the remaining two measures of functionality, internal and external rotation, given their "vastly different" views on the topic. She instead generally credited Karim's evidence that her shoulder's internal and external rotation were limited, and then factored those limitations into a 10% increase of the overall impairment rating. That 10% increase was tethered to the "significant loss of industrial use" caused by Karim's injury, given its effects on her "ability to lift, carry, push or pull when using her arm." That 10% increase was further broken down as "2% for pain, 4% for weakness, 2% for loss of endurance, and 2% for loss of function." The ALJ also awarded 4% compound interest on the benefits, running from when Karim's claim should have been paid in 2014.

DCPS petitioned the CRB for review, raising two arguments relevant here. First, DCPS challenged as insufficiently explained the ALJ's decision to increase Karim's schedule award by 10%. Second, it challenged the ALJ's award of compound interest. The CRB rejected DCPS's first argument, stating:

> The ALJ noted specifically that the additional amounts awarded took into consideration abduction and internal or external rotation. A review of Dr. Rothschild['s] [independent medical examination] shows a detailed analysis of abduction, as well as internal and external rotation and included the amount attributable to abduction and internal or external rotation. While we are cognizant that Dr. Rothschild included these numbers in his permanent impairment rating, they are certainly a specific basis on which to increase the permanent partial disability rating and to satisfy the need for specific evidence on which to rely upon when increasing a permanent partial impairment award. We affirm the 27% permanent partial disability award to the right upper extremity.

However, the CRB reversed the ALJ's award of compound interest, explaining that "the interest payable upon accrued benefits" is to be "calculated on a simple and not a compound basis." It thus remanded with directions that the ALJ enter an award using simple interest.

Before the ALJ could do so, ORM intervened pursuant to a recently-promulgated series of "emergency rules" revising the procedures for resolving disputes over certain schedule awards. *See* 63 D.C. Reg. 15285, 15510–15546 (Dec. 16, 2016).[2] Under the prior procedures that Karim had already navigated, a claimant

---

[2] The emergency rules were subsequently superseded by final amended rules, which took effect in July 2017. *See* 64 D.C. Reg. 6213, 6325 (July 7, 2017). "The final amended rules . . . are substantively the same as the emergency rules." *Frazier v. District of Columbia Dep't of Emp't Servs.*, 229 A.3d 131, 140 (D.C. 2020). For

dissatisfied with the program's decision on a claim for a schedule award was entitled to an evidentiary hearing before an ALJ and, if dissatisfied with the ALJ's determination, an appeal to the CRB. *See* 7 D.C.M.R. §§ 105, 121, 128, 130, 135.2 (2012). Under the revised procedures, many claimants seeking schedule awards— those like Karim whose claims are not filed "within the last 52 weeks" of a temporary disability benefit, D.C. Code § 1-623.06a(a)—are no longer entitled to an evidentiary hearing before an ALJ or review by the CRB. Instead, those claimants can request an audit from ORM's Chief Risk Officer and may then seek further review of that audit in D.C. Superior Court. *See* 7 D.C.M.R. §§ 156.1, 156.5 (2017).

Shortly after those revised procedures went into effect, the program sent Karim a Notice of Benefits calculating her award to be $91,761 based on the CRB's 27% impairment rating and advising her she could appeal the calculation to ORM's Chief Risk Officer. She then appealed to ORM's Chief Risk Officer arguing, among other things, that the program had shortchanged her by not accounting for a number of weeks that the award should have covered and by miscalculating the total amount of interest due. The ORM's Chief Risk Officer agreed with some of Karim's claims and increased her award while instructing her that she had a right to appeal that

---

ease of reference, we cite the final rules throughout this opinion rather than the emergency rules.

determination to D.C. Superior Court. Karim opted not do so, and instead sought to challenge the ORM Chief Risk Officer's determination in the action that she still had pending before DOES ALJ D'Souza, on remand from the CRB.

In that challenge, Karim contested ORM's interest calculation and its new regulations purporting to strip ALJs and the CRB of review over schedule awards like hers. The ALJ then issued a revised compensation order complying with the CRB's direction to issue an award with simple rather than compound interest. But she denied Karim's request to review the Chief Risk Officer's decision, concluding she had no authority to conduct that review. Karim again appealed the decision to the CRB. The CRB affirmed, agreeing that the ALJ (and the CRB itself) lacked authority to review the Chief Risk Officer's conclusions. It reasoned that, under ORM's newly enacted regulations, any challenge to the Chief Risk Officer's decision had to be raised in D.C. Superior Court. These cross-petitions to this court followed.

## II.

We begin with the lone challenge raised in DCPS's petition. It argues that the CRB's affirmance of a 27% impairment rating approved an inadequately explained and insufficiently supported 10% increase over the 17% impairment rating DCPS

concedes was supported by the evidence. Karim counters that the 10% increase was supported by two related factors that the ALJ adequately articulated: the injury's effect on her shoulder's rotation—unaccounted for in the baseline 17% rating—and, relatedly, the injury's overall impact on her earning capacity beyond what was accounted for in the baseline 17% rating. We agree with Karim.

"Under the Administrative Procedure Act, this court may overturn a decision of the CRB only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *McNeal v. District of Columbia Dep't of Emp't Servs.*, 917 A.2d 652, 656 (D.C. 2007); *accord* D.C. Code § 2-510(a)(3) (Repl. 2016). We will not disturb the CRB's ruling so long as "substantial evidence" supports each factual finding and its legal conclusion "flows rationally" from those findings. *See Clark v. District of Columbia Dep't of Emp't Servs.*, 772 A.2d 198, 201 (D.C. 2001). "Substantial evidence" is such evidence as "a reasonable mind might accept as adequate to support a conclusion." *Marriot Int'l v. District of Columbia Dep't of Emp't Servs.*, 834 A.2d 882, 885 (D.C. 2003) (citing *Children's Defense Fund v. District of Columbia Dep't of Emp't Servs.*, 726 A.2d 1242, 1247 (D.C. 1999)). In a workers' compensation case like this, our review is of the CRB's decision, though "we cannot ignore the [ALJ's] order which is the subject of the [CRB's] review." *Poole v. District of Columbia Dep't of Emp't Servs.*, 77 A.3d 460, 465 (D.C. 2013)

(quoting *Georgetown Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 151 (D.C. 2007)).

We agree with the CRB that the ALJ's 27% impairment rating "flows rationally" from its factual findings. *Clark*, 772 A.2d at 201. The ALJ started with a baseline 17% rating that everybody agrees was warranted based on four of six relevant measures of functionality, "loss of forward flexion, extension, abduction, and adduction." That baseline rating did not account for Karim's loss of internal or external rotation in her shoulder, however, and both Drs. Sabloff and Rothschild opined that at least some increase was required to account for her loss of rotation: Dr. Sabloff thought an additional 8% was warranted while Dr. Rothschild put it at 2%. DCPS asserts that to attribute any of the 10% increase to loss of internal or external rotation would be "at odds with" the ALJ's refusal to credit either Dr. Sabloff or Dr. Rothschild's "vastly different" impairment ratings for loss of rotation. We disagree. Although the ALJ did not credit either of their exact measurements, she agreed with their shared assessment that Karim's impairment rating should be increased to account for how her injury negatively impacted her shoulder's rotation. Rather than trying to parse in a vacuum which of the divergent rotation ratings was more accurate, the ALJ decided to factor the loss of rotation into an overall assessment of how Karim's injury diminished her earning potential or "industrial

capacity." Recognizing that "the determination of disability is not an exact science," *Jones v. District of Columbia Dep't of Emp't Servs.*, 41 A.3d 1219, 1224 (D.C. 2012), we think that is a permissible approach.

In implementing that approach, the ALJ considered Karim's loss of rotation as just one factor in her overall assessment that Karim's impairment rating should be increased an extra 2% for pain, 4% for weakness, 2% for a loss of endurance, and 2% for a loss of function. The ALJ then specifically tied this combined 10% increase to Karim's expected wage loss—or "the effect of the work injury on Claimant's industrial capacity"—noting that Karim was "deconditioned for the arduous tasks of corralling children, breaking up fights, standing for prolonged hours, sitting for prolonged hours and writing on a blackboard." As the ALJ reasoned, pain, weakness, loss of endurance, and loss of function all hindered Karim's "ability to lift, carry, push or pull when using her arm," and thereby reduced her future earning capacity. The record supported those findings. The ALJ recounted, for instance, how Karim's shoulder weakness and diminished endurance and function left her "unable to raise her hand sufficient to write on a blackboard or whiteboard placed on the wall because she cannot reach overhead." This finding was bolstered by Karim's "credibl[e]" testimony "that she uses her left arm to raise her right arm to

perform tasks," as well as the ALJ's observation that Karim "had difficulty raising her elbow to the side for internal or external rotation" during the hearing itself.

DCPS counters that there is no telling "how the ALJ determined the 10% increase in impairment." It argues that the reasons for the increase are "a complete mystery," in abrogation of the principle that an administrative agency's judgment "must be set forth with such clarity as to be understandable." *Bowles v. District of Columbia Dep't of Emp't Servs.*, 121 A.3d 1264, 1268 (D.C. 2015) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). DCPS relies on two cases where we remanded a compensation order for further explanation because the ALJ's basis for the award was so inadequately explained and internally inconsistent that we were unable to "meaningfully review" the decision and gauge whether substantial evidence supported it. *See Jones*, 41 A.3d at 1225–26; *Bowles*, 121 A.3d at 1269–70. Neither resembles this case.

*Jones* concerned a District employee who injured her left knee after falling down stairs. Her treating physician determined she had a 20% impairment; an independent medical examiner put it at 6%; the program split the difference and found she had a 13% impairment; the ALJ reduced that to 7%; and the CRB affirmed. When claimant appealed, we could not ascertain how the ALJ arrived at

its 7% determination—it was indiscernible on the record—leading us to remand for further consideration and explanation. *Jones*, 41 A.3d at 1223. We found the ALJ's reasoning not only conclusory but contradictory when it asserted that "claimant qualifies for a 7% permanent partial disability award . . . *setting aside any consideration of wage loss but presuming an effect on claimant's earning capacity*." *Id.* at 1226. Disability adjudications "require[] a determination of an economic wage loss," and by purporting to set that wage loss aside while at the same time presuming it to exist, the ALJ left us with "a complete mystery" of how she arrived at her determination. *Id.* We ultimately could discern no explanation why the ALJ determined "the disability award should be 7%—and not, for example, 1%, 10% or 30%." *Id.* Similarly, in *Bowles*, the ALJ failed to explain its finding that the claimant's right leg was 10% permanently impaired. 121 A.3d at 1269–70. The ALJ rejected a physician's 17% disability for antalgic gait because only a 7% impairment was warranted for that condition. *Id.* at 1270. And, although the ALJ credited the physician's findings that the claimant suffered 8% disability for atrophy and 5% for pain, "[n]o combination of 7%, 8%, and 5% add up to just 10%." *Id.*

We do not have any similar difficulty deciphering the ALJ's reasoning in this case. In *Bowles*, for instance, the simple arithmetic did not add up, which is not the case here. And in *Jones*, the ALJ incoherently purported to set wage loss aside in

one breath, but then presumed some wage loss to have occurred in the next, and ultimately gave no indication of whether, in fact, she accounted for that wage loss in her final calculation (and if so, she was silent as to why that wage loss warranted a 1% increase as opposed to, say, a 30% increase). Those cases bear no resemblance to this one, where the ALJ was quite clear that she was increasing Karim's impairment rating by 10% for loss of industrial use, bolstered by her loss of internal and external rotation, and then broke that 10% down into four sub-categories related to that loss of industrial use. Unlike in *Jones* and *Bowles*, the reasoning is neither indecipherable nor internally inconsistent.

Finally, DCPS persists that the four factors the ALJ relied upon for this 10% increase (pain, weakness, loss of endurance, and loss of function) are not appropriate considerations in calculating permanent disability awards under the CMPA. Those four factors are expressly enumerated as proper considerations in the private-sector analogue to the CMPA—the Workers' Compensation Act[3]—but not in the CMPA. So, DCPS reasons that the D.C. Council must have intended to foreclose consideration of those factors in public-sector cases under the CMPA, like this one.

---

[3] *See* D.C. Code § 32-1508(U-i) ("In determining disability pursuant to . . . this subsection, the most recent edition of the [AMA Guides] may be utilized, along with the following 5 factors: (i) Pain; (ii) Weakness; (iii) Atrophy; (iv) Loss of endurance; and (v) Loss of function.").

*See Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 952 A.2d 168, 174 (D.C. 2008) ("Where a statute, with reference to one subject, contains a given provision, the omission of such a provision from a similar statute concerning a related subject is significant to show that a different intention existed.") (cleaned up).

We doubt that. We typically interpret the CMPA and the Workers' Compensation Act "to be consistent with each other, even where the statutes' language is not identical." *Brown-Carson v. District of Columbia Dep't of Emp't Servs.*, 159 A.3d 303, 307 (D.C. 2017). The CRB has long interpreted the CMPA to grant the program discretion to give independent force and weight to an employee's "industrial or occupational loss of use" when calculating disability awards. *See, e.g.*, *Barron v. District of Columbia Dep't of Emp't Servs.*, CRB No. 06-054, 2006 WL 3019509, \*3–5 (Sept. 6, 2006). But we ultimately do not resolve this issue because DCPS makes this argument for the first time on appeal,[4] and the CRB expressly

---

[4] DCPS also asserts for the first time on appeal, and in a footnote, that an ORM regulation provides that "the only appropriate bases" for the ALJ determining "the extent of Karim's disability" are the ratings provided in the AMA Guides relied upon by Drs. Sabloff and Rothschild. *See* 7 D.C.M.R. § 140.5 (2017). That is not what that regulation says. The provision DCPS highlights merely directs claimants to submit a physician's permanent disability rating under the AMA Guides as one component of the "information and documentation" supporting a claimant's claim

noted that DCPS did "not appeal the ALJ's determination that the[se] factors are relevant to the award." Under those circumstances, we exercise our discretion not to resolve the point. *See District of Columbia v. District of Columbia Contract Appeals Bd.*, 145 A.3d 523, 530 n.9 (D.C. 2016) ("This court will generally not review issues raised for the first time on appeal," though that is subject to "discretion.").

The 10% increase to Karim's impairment rating is supported by substantial evidence and the ALJ did not fail to adequately explain itself when arriving at that figure.

## III.

We now turn to the CRB's ruling that Karim was entitled only to simple interest on her award, contrary to the ALJ's and Karim's view that compound interest was available and warranted. The CRB followed its own prior precedent in which it concluded that an applicable statute, D.C. Code § 28-3302(b) (2012 Repl.), does not expressly authorize compound interest, and "in the absence of any statutory

---

for compensation. *Id.* It does not put any restrictions on what else an ALJ might consider.

authority for compound interest, interest should be calculated on a simple basis in compensation cases." *Harrison v. District of Columbia Dep't of Corrs.*, CRB No. 16-084, 2016 WL 6659076, at \*19 (Oct. 20, 2016).[5] Karim does not dispute that § 28-3302(b) does not authorize an award of compound interest. She instead contends that "no statutory authority is required to award compound interest" because "[a]n award of compound interest is permitted at common law," so that statutory silence should mean that compound interest is permitted. We agree with DCPS that § 28-3302 authorizes only an award of simple interest and disagree with Karim that the ALJ had a freestanding "common law" or "equitable" authority to award compound interest.

Section 28-3302(b) is a general provision providing for interest on judgments against the District of Columbia, and is neither part of nor particular to the CMPA. It provides that interest "on judgments or decrees against the District of Columbia," when authorized, shall be "at the rate of not exceeding 4% per annum." This provision's terms are silent as to whether interest should be calculated on a simple or a compound basis, though the statute's history offers some insight on that topic. "Section 28-3302(b) originated from a subsection of an 1890 appropriations Act of

---

[5] That view dates back to 2004, when the CRB's predecessor first adopted it. *Clark v. Verizon*, OHA 92 No. 92-793B, Dir., Dkt. 03-92, at \*3 (Feb. 10, 2004).

Congress addressing payments of judgments against the District of Columbia.” *Naccache v. Taylor*, 199 A.3d 181, 184 (D.C. 2018) (citation omitted). That Act provided that “interest, when authorized by law, on judgments against the District . . . shall be at the rate of not exceeding four per centum per annum.” *Id.* When Congress later enacted virtually identical language in 1964 as § 28-3302(b), it made clear that “codification was ‘not intended to make any substantive change in existing law.’” *Id.* at 185 (citation omitted).

At the time of both the 1890 Act and the subsequent 1964 enactment, the “general rule” was that “compound interest [was] not allowed to be computed” on a debt “in the absence of a contract therefor or some statute” authorizing it. *Cherokee Nation v. United States*, 270 U.S. 476, 490 (1926) (collecting cases); *accord U.S. Mortg. Co. v. Sperry*, 138 U.S. 313, 342–43 (1891); *Baker v. Cummings*, 8 App. D.C. 515, 524 (D.C. Cir. 1896) (provision providing for “interest at the rate of six per centum per annum” on contract judgments construed “to forbid the compounding of . . . accrued interest”), *rev’d on other grounds by* 169 U.S. 189 (1898); *see also, e.g., Lewin v. Folsom*, 50 N.E. 523, 523–24 (Mass. 1898) (describing “settled” principle “that interest upon interest cannot be recovered” because of “the ancient unwillingness to allow compound interest”); *Giant Food, Inc. v. Jack I. Bender &*

*Sons*, 399 A.2d 1293, 1304 (D.C. 1979) ("Prejudgment and judgment interest are ordinarily not compounded in the absence of contract provision.").

Until fairly recently, courts had virtually always construed rate-of-interest statutes silent on the method of computation as permitting simple interest only. They reasoned that compound interest "hastens the accumulation of debt," *Abramowitz v. Washington Cemetery Ass'n*, 51 A.2d 461, 463 (N.J. 1947), benefits "negligent creditors" who fail to "collect their interest when it [becomes] due," *State ex rel. Nw. Mut. Life Ins. Co. v. Bland*, 189 S.W. 2d 542, 548 (Mo. 1945), and was thus "iniquitous," *Whitcomb v. Harris*, 38 A. 138, 140 (Me. 1897). Those rationales do not seem to apply to disability claimants, and the general preference for simple interest has fallen into disfavor in more recent decades. *See, e.g., Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys.*, Inc., 325 F.3d 924, 938 (7th Cir. 2003) ("We believe that, absent special circumstances, compound, not simple, interest ought to be awarded."); *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 839–43 (9th Cir. 2012) (en banc) (examining "[t]he language and structure of the [Longshore and Harbor Workers' Compensation] Act" along with its "interlocking provisions facilitating

prompt payments" and its express authorization of compound "post-judgment" interest as compelling compounding pre-judgment interest).[6]

Nevertheless, this historical backdrop leads us to conclude that Congress did not authorize compound interest when enacting § 28-3302(b), prior to the judicial shift toward favoring compound interest awards. "The legislature is presumed to know the common law before the statute was enacted." *District of Columbia Pub. Schs. v. District of Columbia Dep't of Emp't Servs. & Proctor*, 95 A.3d 1284, 1287 (D.C. 2014). When a statutory provision "covers an issue previously governed by the common law," courts presume the legislature "intended to retain the substance of the common law" unless there is a clear indication to the contrary. *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010) (citing *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). Had Congress intended to authorize compound interest, contrary to the common law's then-extant default rule permitting simple interest alone, it

---

[6] *See also Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1116 (7th Cir. 1998) ("It is, of course, settled in the case law that compounding of pre-judgment interest is acceptable."); *E.E.O.C. v. Kentucky State Police Dept.*, 80 F.3d 1086, 1098 (6th Cir. 1996) (affirming trial court's assessment of compound pre-judgment interest on state troopers' back pay award and emphasizing that compound interest should "ordinarily" be awarded on back pay); *Sands v. Runyon*, 28 F.3d 1323, 1328 (2d Cir. 1994) (trial court abused its discretion in not awarding back pay with compound pre-judgment interest).

likely would have said so expressly or, at the very least, we would see some evidence of that intent in the legislative history. But there is none.

Karim asserts that the lack of statutory authorization for compound interest does not matter. That is because, in her view, a "trial court has equitable discretion" to award compound interest even absent express statutory authorization. *See Burke v. Groover, Christie & Merritt, P.C.*, 26 A.3d 292, 304–06 (D.C. 2011) (approving compound interest on tort damages as within trial court's equitable powers). That is certainly not always true. *See, e.g.*, *Rastall v. CSX Transp.*, 697 A.2d 46, 53 (D.C. 1997) (finding award of compound interest erroneous given lack of statutory or contractual authority for it). But even if it were, the proposition that courts have equitable powers to award compound interest does not mean that agencies enjoy the same leeway. Unlike courts, administrative tribunals do not have general equitable powers, only "narrowly defined statutory and regulatory powers." *Ramos v. Dep't of Consumer & Regulatory Affairs*, 601 A.2d 1069, 1073 (D.C. 1992). "[A]n administrative agency may not act in excess of its statutory authority," and absent "statutory or regulatory authority, a regulatory agency may not impose remedial measures." *District of Columbia Office of Tax & Rev. v. Shuman*, 82 A.3d 58, 69 (D.C. 2013) (quoting *Davidson v. District of Columbia Bd. Of Med.*, 562 A.2d 109, 112 (D.C. 1989)). While the CRB did not rely on this regulation in its analysis, we

note that the regulations governing compensation awards provide that they "shall be limited to simple interest." 7 D.C.M.R. § 161.3.[7]

Karim suggests the above reasoning "simply cannot withstand this Court's analysis in" *District of Columbia Pub. Sch. v. District of Columbia Dep't of Emp't Servs.*, 123 A.3d 947, 951–53 (2015) ("*Mitchell*"). We disagree.[8] *Mitchell* is not in any tension with the above principles. It reasoned "[a]s a matter of statutory construction" that the CMPA itself "authoriz[es] interest to be paid on workers' compensation claims"; it did not suggest agencies have the free-roaming equitable authority that Karim advances in support of her view. *Id.* at 948, 951–52. In *Mitchell*, we stressed the interpretive point that the CMPA should be construed similarly to its private-sector analogue, which permits interest on compensation awards, so that the CMPA should be "similarly construed as permitting interest on accrued benefits." *Id.* at 952. Karim does not flesh out any similar statutory

---

[7] This regulation was promulgated as an emergency rule mere months before the CRB issued its decision limiting Karim to simple interest, as part of the same emergency rules amendments discussed above in footnote two and accompanying text. That timing perhaps explains the CRB's lack of reliance on this regulation.

[8] If *Mitchell* were in fact irreconcilable with those earlier cases, as Karim argues, it is the earlier precedents—*Ramos*, *Shuman*, and *Davidson*—that would be binding, not *Mitchell*. *See Thomas v. United States*, 731 A.2d 415, 420 n.6 (D.C. 1999) ("Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one.").

argument here about the CMPA itself authorizing compound interest, but instead presses the view—erroneous in our view, at least when it comes to an agency's powers—that "no statutory authority is required to award compound interest."

## IV.

Karim's final argument is that the CRB erred in affirming the ALJ's conclusion that she lacked authority to review the program's computation of her award after the ORM Chief Risk Officer's audit. As discussed above, shortly after the CRB initially ruled in this matter and directed the ALJ to issue an order with simple interest on remand, ORM promulgated a series of regulations revising the review procedures for schedule awards. The program then promptly and *sua sponte* sent Karim a Notice of Benefits, seemingly dividing her case onto two separate tracks: (1) the initial case that was still pending before the ALJ after a remand from the CRB, and (2) any new challenge she might raise to the computation of her award via the revised review procedures—an audit by ORM's Chief Risk Officer, followed by review in D.C. Superior Court. Karim sought to consolidate those two tracks before the DOES ALJ. However, the ALJ denied her consolidation request and the CRB affirmed, concluding that they lacked authority to review a decision of ORM's Chief Risk officer. "Pursuant to the [ORM's] Emergency Rules," the CRB reasoned,

"the authority to address an appeal of the [ORM's decision] now rests with the Superior Court."

Karim raises two main challenges to that ruling: (1) ORM's rules revising the review procedures for schedule awards are invalid because they are inconsistent with the CMPA, which guarantees schedule award claimants review by DOES; and (2) even if she is wrong about that, the revised procedures should not be applied retroactively to her claim, filed long before the procedures took effect, because they frustrate Karim's "antecedent rights and expectations, resulting in manifest injustice." We address her arguments in turn, and conclude that each is foreclosed by *Frazier v. District of Columbia Dep't of Emp't Servs.*, 229 A.3d 131 (D.C. 2020).

## A.

## 1.

Karim first contends ORM lacked authority to issue the regulations revising the appeals process because those regulations contravene the CMPA. In her view, the CMPA vests DOES with the exclusive authority—until recently exercised through its delegates, ALJs and the CRB—to hold "disability compensation hearings" and to exercise "adjudication powers" over schedule awards. In Karim's

view, the ORM regulations divesting DOES of its authority to review schedule awards violate the CMPA. She cites a host of statutory provisions for that view, and we highlight two of them here: D.C. Code § 1-623.02a, which states the Mayor may delegate "any of the powers conferred on him or her by this chapter . . . *except disability compensation hearings and adjudication powers*, pursuant to § 1-623.28, which shall be exercised by the Director of [DOES]." *Frazier*, 229 A.3d at 138 (emphasis added). And D.C. Code § 1-623.24(d), which confers authority upon DOES ALJs to review program decisions pertaining to "a change of condition" prompting the "modification of [an] award." *See also* D.C. Code § 1-623.24(b) (cross-referenced in § 1-623.24(d)(2) and providing for a hearing before a DOES ALJ). Because Karim contends schedule awards fit that description of an award modification owing to a change of condition, she argues that ORM's regulations purporting to divest DOES of its express statutory authority are void because they violate the CMPA's statutory commands.

After briefing was completed in this appeal, we decided *Frazier*, which rejected the core of Karim's arguments. In *Frazier*, the petitioner had her schedule award denied by the program and was advised that any appeal had to be taken to ORM's Chief Risk Officer. Rather than abiding that advice, she sought review before an ALJ, and then the CRB. Both determined they lacked jurisdiction because

ORM's regulations had vested review authority in ORM's own Chief Risk Officer, followed by review in D.C. Superior Court. 229 A.3d at 135. On appeal, we upheld ORM's authority to promulgate the same regulations at issue here regarding how schedule awards are reviewed. *Id.* at 138.[9] In doing so, we "defer[red] to ORM's reasonable interpretation that providing for [Chief Risk Officer] review of denials of requests for schedule awards is more consistent with the Council's intent as reflected in the [CMPA] than was the prior regulation that provided for appeals to an ALJ." *Id.* at 139. More specifically, we endorsed ORM's view that claims for schedule awards are not "modification[s] of award[s]" entitled to ALJ review under § 1-623.24(d), because that statutory phrase "refers to *a reduction in or terminations of benefits* 'because of a change to the claimant's condition,'" not to claims for schedule awards. *Id.* at 136 (emphasis added).

We are now bound by that conclusion. *Frazier* clearly held the CMPA presents "no bar to ORM's adoption" of rules divesting ALJs and the CRB of their prior authority to review schedule awards, and vesting that authority in ORM's Chief Risk Officer and D.C. Superior Court. *Id.* at 139. That forecloses Karim's argument.

---

[9] *See also Webb v. District of Columbia Dep't of Emp't Servs.*, 204 A.3d 843, 847 (D.C. 2019) (concluding ORM had authority to issue other rules concerning DOES hearings and adjudications).

**2.**

We pause to note that the CRB has advanced an interpretation of the CMPA at odds with the ORM interpretation we deferred to in *Frazier*. *Harrison*, 2016 WL 6659076. In *Harrison*, the CRB held—contrary to the ORM's reasoning—that a "change of condition" under § 1-623.24(d) "need not be a positive change in a claimant's physical capacity," but instead "could be, for example, the worsening of that capacity, from partial to worse, or total incapacity, or the passage of time and a lack of improvement leading to a change in the nature of a disability from temporary to permanent." *Id.* at *9. There is no indication in the *Frazier* opinion that the division was aware of the CRB's interpretation, as *Harrison* was not mentioned in *Frazier*'s briefing or during the oral argument in that case. Because we owe deference to the CRB's interpretation of the CMPA, it is not obvious which agency we would have accorded deference to had we grappled with these conflicting CRB and ORM interpretations in *Frazier*. *See Frazier*, 229 A.3d at 147–48 (McLeese, J., dissenting) ("[I]t appears to me to be unsettled . . . which agency, if any, would be entitled to deference in deciding" who "has jurisdiction to review ORM's initial decision of permanent partial disability claims," noting that we had never "previously accorded deference to ORM, instead stating that deference is owed to the CRB.") (citation omitted).

The District of Columbia litigated *Harrison*, both before the CRB and in an appeal before this court raising the same issue we later confronted in *Frazier*—albeit with the relevant agency having decided against it in *Harrison*. But it voluntarily dismissed its *Harrison* appeal without explanation days after argument, prior to disposition, and less than a month after filing its opening brief in *Frazier*, where it had the benefit of a more favorable agency ruling. We therefore find it troubling that the District did not mention *Harrison* at any point in the *Frazier* litigation, instead successfully urging us to defer to ORM's interpretation of the CMPA while omitting any mention of the CRB's contrary interpretation.

This division requested an explanation via supplemental briefing on the matter, after counsel for the District was questioned about whether the *Frazier* division "gave any consideration to the CRB's interpretation of the [CMPA]" announced in *Harrison*, and counsel seemed to answer in the affirmative by responding that "*Harrison* was certainly a part of [*Frazier*]." In its supplemental brief, the District now acknowledges that, in *Frazier*, it made no mention of *Harrison*, though it asserts that it did not mean to suggest otherwise at argument, where it instead only meant to convey that the "'issues' of statutory interpretation discussed in *Harrison*" were likewise litigated in *Frazier*. However, that would have been non-responsive to the question whether the *Frazier* division had been apprised

of and considered deferring to the CRB's holding in *Harrison*. Assuming a good-faith misunderstanding of the question posed, we are left without any explanation for why the District did not flag *Harrison* for this court in *Frazier*. To be clear, our critique is not of our colleagues in *Frazier*, but of the District's litigation tactics in first dismissing *Harrison* and then making no mention of it in *Frazier*, for reasons that remain unexplained. We cannot rule out the possibility that the District concluded that silence was to its strategic advantage.[10]

While we nonetheless conclude that we, as a division, are now precluded from revisiting the question squarely decided in *Frazier*, this court is not without recourse. Most immediately, we might reconsider this issue en banc, with the newfound understanding that the CRB—an agency that has at least equal if not more expertise

---

[10] The District hints that the CRB had a change of heart after *Harrison*, and in *Frazier* itself determined that schedule awards are not "modifications" of existing awards under the CMPA. We disagree. The CRB in *Frazier* never suggested that it disagreed with the interpretation of the CMPA that it announced in *Harrison*, but instead found that interpretation had been superseded by ORM's emergency rules. *Frazier v. District of Columbia Public Schools*, CRB No. 17-108, 2017 WL 6886206, at *2-3 (Dec. 28, 2017). Similarly, while the CRB has more recently said that "a change in disability status from temporary to permanent does not constitute a change in condition pursuant to § 1-623.24(d) of the CMPA," *McLaughlin v. District of Columbia FEMS*, CRB No. 20-081, 2020 WL 9073065 (Oct. 23, 2020), that is unsurprising given that *Frazier* now compels it to reach that conclusion. We have little reason to doubt the CRB continues to think the interpretation it advanced in *Harrison* is the better reading of the CMPA, its adherence to intervening regulations and precedent notwithstanding.

than ORM in administering the CMPA—has adopted an interpretation contrary to the one we deferred to in *Frazier*.

**B.**

Karim's final argument also fails because it is foreclosed by *Frazier*. She contends, as the *Frazier* petitioner did, that even if ORM's recent regulations do not contravene the CMPA, it was unjust to apply those regulations to her case because it bifurcated her right to appellate review. Her argument is based on the same principle, and the same case law, discussed in *Frazier*—that a new procedural rule "in effect at the time a decision is rendered shall not be applied where 'doing so would result in manifest injustice.'" 229 A.3d at 140 (quoting *Holzsager v. D.C. Alcoholic Beverage Control Bd.*, 979 A.2d 52, 57 (D.C. 2009) and *Scholtz P'ship v. D.C. Rental Accom. Comm'n*, 427 A.2d 905, 914 (D.C. 1981)).

*Frazier* rejected that argument for two reasons, equally applicable here. First, we deferred to ORM's view that the now-repealed 2012 regulations granting ALJs the authority to review schedule awards, 7 D.C.M.R. § 121.18 (2012), conflicted with the CMPA. 229 A.3d at 139. From that premise, we concluded the petitioner never truly had a right to that manner of review so that depriving her of it was no injustice. While Karim contends the application of ORM's new rules frustrated her

"antecedent rights and expectations," this first point from *Frazier* makes clear that she never had the antecedent right she thought she had, and that her expectations were therefore misplaced. Second, even if that were not the case, ORM's new regulations "merely altered the procedure by which petitioner could obtain her objective of receiving a schedule award," and procedural rules in effect at the time of decision are to be applied unless "doing so would result in manifest injustice." *Id.* at 140–41 (quoting *Holzsager*, 979 A.2d at 57). We discerned no such injustice in *Frazier*—where petitioner had her case dismissed for lack of jurisdiction after failing to follow the revised ORM procedures—and we think it follows that Karim likewise suffered no "manifest injustice" meriting reversal here. She could have challenged the ORM Chief Risk Officer's determination in D.C. Superior Court, but opted not to.

We thus agree with the CRB that it, and the ALJ before it, lacked authority to review the ORM Chief Risk Officer's decision regarding Karim's benefit award.

**V.**

We conclude that the CRB did not err in arriving at its 27% impairment rating or in determining that Karim was entitled to only simple interest on her award. As for Karim's argument that ORM lacked authority to issue the regulations she now

challenges, we are bound by *Frazier* to disagree.  We therefore affirm the CRB's order.

*So ordered*.